437 A.2d 952

COMMONWEALTH of Pennsylvania, Appellee

v.

Patricia TEMPEST, Appellant.

No. 334.

Supreme Court of Pennsylvania.

Submitted Oct. 26, 1981.

Decided Dec. 17, 1981.

Carmen C. Nasuti, court-appointed, Philadelphia, for appellant.

Robert B. Lawler, Chief, Appeals Div., Kenneth Gallant, Philadelphia, for appellee.

Before O'BRIEN, C. J., and ROBERTS, NIX, LARSEN, FLAHERTY, KAUFFMAN and WILKINSON, JJ.

## OPINION

LARSEN, Justice.

In a nonjury trial, Mrs. Patricia Tempest (appellant) was convicted of murder of the first degree for the drowning of

her six-year old son. Post-verdict motions were denied and appellant was sentenced to life imprisonment. This direct appeal followed and presents issues of whether the evidence was sufficient to find appellant sane and guilty of murder of the first degree, and whether appellant's confession was properly admitted into evidence.[1]

The record discloses that appellant has been emotionally disturbed since adolescence. Evidently, appellant suffers from depression and low self-esteem, and perceives herself as unattractive and a loner. Prior to the homicide, appellant had been hospitalized for mental illness seven or eight times, the first time at age fifteen and twice following suicide attempts. But despite her problems, appellant married Ronald Tempest and had one son, Gregory, the victim. A psychiatrist who counselled the Tempest family described them as an intact and affectionate family.

On June 18, 1976, tragedy struck this family. Appellant's confession relates in part the facts:

> I got up quarter to eleven or something like that. My husband had already left to go to work. I gave Gregory his breakfast. He was already up watching T.V. It was the last day for kindergarten. I was packing him a lunch for his picnic. I gave him juice with vitamin E. I told him he had to get a bath. He didn't want to go right away. He wanted to finish watching his program so I told him to come up after he did. I went upstairs and filled the tub. I filled it more than normal. When he came upstairs he noticed and said it was kind of deep. He got in the tub himself. I washed the front of his body, then I told him to turn around on his stomach. He told me I didn't wash his face yet. So, I washed his face. I told him to turn on his stomach. When he did I pushed his face down. He struggled and cried, 'Mommy you're drowning me.' He kept fighting for a couple of minutes—it could have been longer. He still tried to move a

---

1. Appellant also raises an issue concerning certain medical records. This issue was not raised in post-verdict motions, hence waived. *Commonwealth v. Parker*, 494 Pa. 196, 431 A.2d 216 (1981).

little but I kept his head under until he stopped. He didn't move any more so I got out of the tub, I had gotten into the tub to hold him down. I didn't know how long it would take to drown, so I left him there in the tub. He was on his back. His face was sideways. I sat there and told him 'I had to kill you. I'm sorry.' I went into the bedroom, put the television on and watched the movie. I went downstairs and got a banana and ate it, and also took my medicine. I came back upstairs and watched another program—$20,000 pyramid. My husband came home at 25 of 4. I told him I killed Greg. I'd drowned him. He went upstairs and came back and looked very sad.

Appellant's husband summoned the police. Appellant was taken into custody at 3:40 p. m., was given *Miranda* warnings, and signed the aforementioned lucid confession at 5:40 p. m. Additionally in this confession, appellant describes her motive for the killing in these disturbing terms:

Q: Why did you drown Greg?

A: My husband made friends down the street. Greg played with Joey, the little boy down the street. I didn't have any friends. I'm afraid of everybody. I don't really know why I did it. I just did—I didn't want Ronnie and Greg in my life anymore.

Q: Why didn't you want them in your life any more?

A. Greg was too demanding. He got on my nerves. Just having to do things for him. I didn't want the responsibility. I didn't want him to go into 1st grade because I would have to talk to other people. I didn't want to be a housekeeper and have people come to my house. My husband did most of the work.

Appellant repeated essentially the same statement of motive to the arresting officer, her husband, and a psychiatrist.

A psychiatrist who examined appellant after the homicide diagnosed her as suffering from chronic schizophrenia, acute type. The trial court determined that appellant was incompetent to stand trial on November 11, 1976. Appellant,

however, was adjudged competent on June 13, 1978, and subsequently tried.

Appellant first contends that the evidence was insufficient to prove her sanity. Since appellant offered evidence of insanity, the Commonwealth had the burden of proving appellant's sanity beyond a reasonable doubt. *Commonwealth v. Demmitt*, 456 Pa. 475, 321 A.2d 627 (1974); *Commonwealth v. Green*, 493 Pa. 409, 426 A.2d 614, 616 (1981). This Court has adopted the test for legal sanity announced in *The Queen v. M'Naghten*, 10 Cl. & Fin. 200, 8 Eng.Rep. 718 (1843), which provides that an accused is criminally responsible unless at the time of committing the act, due to a defect of reason or disease of the mind, the accused (1) did not know the nature and quality of the act or (2) did not know that the act was wrong. *Commonwealth v. Woodhouse*, 401 Pa. 242, 164 A.2d 98 (1960); *Commonwealth v. Hicks*, 483 Pa. 305, 396 A.2d 1183 (1979). Appellant introduced psychiatric testimony that she did not know right from wrong, hence appellant's insanity claim rests on the second part of the *M'Naghten* test. We find, however, that the evidence (read in the light most favorable to the Commonwealth as verdict winner, *Commonwealth v. Green, supra*) proved beyond a reasonable doubt that appellant did know the killing was wrong.

Appellant's acts and statements near the time of the killing clearly support the inference that she knew the killing was wrong. *Commonwealth v. Demmitt, supra.* Appellant confessed that she told her dead child, "I had to kill you, I'm sorry." Moreover, when asked by the interrogating detective, "Do you know the difference between right and wrong?" Appellant responded, "Yes, I know killing Greg was wrong." All other portions of appellant's confession are coherent and evince appellant's lucidity. Furthermore, the testimony of lay witnesses can establish appellant's sanity. *Commonwealth v. Tyson*, 485 Pa. 344, 402 A.2d 995 (1979). The interrogating detective testified that appellant was lucid and responsive throughout the interview. Appellant's husband, the first person on the scene, testified that his wife

was calm. Finally, the medical testimony in this case belies appellant's insanity claim. Dr. Burt and Dr. Glass, both called for the defense, testified that appellant could tell right from wrong. Dr. Glass so stated unequivocally. Dr. Burt, while admitting that appellant could tell right from wrong "on the surface", claimed that she *really* could not, due to her psychosis. The trial court expressly rejected Dr. Burt's testimony as vacillating and imprecise. The trier can repudiate even expert psychiatric testimony of insanity. *Commonwealth v. Hicks, supra.* Accordingly, the evidence is sufficient to sustain a finding that appellant was sane.

■ Undoubtedly, appellant's terrible deed is not the product of a sound mind. But mental illness alone cannot absolve appellant from criminal responsibility. *Commonwealth v. Bruno,* 466 Pa. 245, 352 A.2d 40 (1976); *Commonwealth v. Tyson, supra.* The *M'Naghten* test can embrace those mentally disturbed in the category of those criminally responsible. *Commonwealth v. Demmitt, supra; Commonwealth v. Pifer,* 284 Pa.Super.Ct. 170, 425 A.2d 757 (1981).

Appellant next contends that she was unable to form the specific intent for murder of the first degree due to diminished mental capacity. 18 Pa.C.S.A. § 2502; *Commonwealth v. Walzack,* 468 Pa. 210, 360 A.2d 914 (1976); *Commonwealth v. Brantner,* 486 Pa. 518, 406 A.2d 1011 (1979). Dr. Burk and Dr. Glass both concluded that appellant did not have sufficient mental capacity to form specific intent. This psychiatric testimony, however, was rejected by the trier. *Commonwealth v. Demmitt, supra.*

■ In contrast, the record contains direct evidence of appellant's specific intent to kill. Appellant told her husband that she planned the killing three days in advance. (In fact, appellant pondered "bumping off" her husband as well.) Appellant told Dr. Glass that she considered using poison, drowning, or firearms on her child and husband. Further, appellant's confession contains the following exchange:

Q: When you went upstairs to fill the tub for Greg's bath, had you planned on drowning Greg?

A: Yes.

Q: How much water did you put in the tub?

A: About 3 or 4 inches—I don't know.

Q: Is this more than normal?

A: No, but I filled it up more after he got in the tub.

Filling the tub with additional water to facilitate the drowning compels the inference that appellant possessed the specific intent to kill. The very manner of the killing also supports this inference. The medical examiner testified that Gregory had cuts and scratches on the left side of his neck and his upper left arm. This corroborates appellant's account of Gregory's struggles while he was held under water. Appellant persisted in holding Gregory down despite his plea, "Mommy you're drowning me." We can infer the specific intent to kill from the act of forcibly holding a thrashing victim under water until he ceases to struggle. This is similar to inferring a specific intent to kill from the use of a deadly weapon on a vital part of the body. *See Commonwealth v. Thornton*, 494 Pa. 260, 431 A.2d 248 (1981). Finally, while demonstrating motive is not necessary to prove murder of the first degree, it is probative evidence of specific intent to kill. *Commonwealth v. Tomoney*, 488 Pa. 324, 412 A.2d 531 (1980). Appellant repeated, at various times, her motive for the killing—that Gregory got on her nerves and that she wanted her husband and child out of her life. We conclude that the Commonwealth has adduced ample evidence to reject the diminished capacity defense and prove that appellant possessed the specific intent to kill.

■ Appellant finally contends that her confession was involuntary and that the waiver of her *Miranda* rights was defective, due to her mental illness. The record, however, reveals that after having been advised of her *Miranda* rights, appellant waived them and gave a voluntary confession. In a conversation with Dr. Glass over two years later, appellant remembered receiving her *Miranda* warnings. After the warnings, appellant was fully aware of why she was in the police station: "Because I drowned my son." The interrogating detective testified that she was lucid and

responsive throughout the interview, and her coherent confession bears this out. Appellant recalls being treated well at the station. Dr. Glass testified that appellant's memory of events was intact, and that her intelligence was the "dull normal" range. Dr. Glass also testified that in his opinion appellant understood the words of the *Miranda* warnings and that her confession was voluntarily given. This evidence supports the lower court's findings that appellant's confession was voluntary and that her waiver of her *Miranda* rights was not defective.

Judgment of sentence affirmed.

O'BRIEN, C. J., and ROBERTS, J., concurred in the result.