461 A.2d .775

**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**Elvita BRACEY, Appellee.**

Supreme Court of Pennsylvania.

Submitted Oct. 18, 1982.

Decided June 3, 1983.

---

Eric B. Henson, Deputy Dist. Atty., Sarah B. Vanden-braak, Asst. Dist. Atty., for appellant.

Gilbert J. Scutti, Philadelphia, for appellee.

Before ROBERTS, C.J., and NIX, LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON and ZAPPALA, JJ.

## OPINION

HUTCHINSON, Justice.

A jury convicted appellee of voluntary manslaughter and related charges in connection with the stabbing death of her infant daughter on Easter Sunday, March 26, 1978. The trial court vacated the conviction and granted her a new trial on the ground that her spontaneous statements to police were not voluntary because they were prompted by internal compulsion resulting from her paranoid schizophrenic mental condition. The Commonwealth appealed directly to this Court.[1]

We hold that neither the Fifth nor Fourteenth Amendments to the United States Constitution nor our own constitution require the suppression of statements made by a criminal defendant as "involuntary" in the absence of custodial interrogation or its functional equivalent.

The testimony at trial as to the statements made by the appellee to the police, did not differ materially from the testimony at the suppression hearing. That testimony was as follows: Several Philadelphia police officers observed her running naked down the street. When one of the officers, Officer Young, attempted to stop appellee, she screamed and continued to run. The officers followed appellee for approximately four and one-half blocks until she entered a house.

Officer Branch entered the house and asked appellee why she was running. She did not respond to him but told two ladies sitting with her, "Me and Bobby were fighting. He

1. This Court has jurisdiction of this direct appeal from the judgment of sentence under section 2 of the Judicial Code, Act of July 9, 1976, P.L. 586, No. 142, 42 Pa.C.S. § 722(1). Subsequent to appellant's conviction the legislature amended the Judicial Code, omitting the provision for direct appeals from all final orders of the Court of Common Pleas involving felonious homicide. Act of September 23, 1980, P.L. 686, No. 137, effective November 23, 1980. This appeal was taken prior to the effective date of the amendment, which limits our jurisdiction on direct appeal to capital cases.

had a butcher knife. The baby got in the way. I tried to take it away from him." Because appellee had what appeared to be blood on her hands and forehead, Officer Branch, accompanied by Deborah Clark, one of the women present in the house, transported appellee to the hospital.

After appellee arrived at the hospital, Officer Palma, who did not know her, told Officer Branch that there were "goofy people on Easter Sunday, since some woman had just stabbed her daughter and killed her". Appellee overheard this comment and dropped to her knees, became hysterical, began banging her hands on the floor and shouted: "Oh my God, I didn't mean to do it", "He killed her", and "Don't tell me my baby is dead". "Bobby Little did it." The officers managed to calm appellee and placed her in a chair. After the expiration of several minutes, appellee tugged on Officer Troutner's sleeve and stated: "Officer, I didn't mean to do my baby. I wanted to kill him. I didn't want to kill my baby." [2]

While appellee was being escorted to the patrol wagon shortly thereafter, she became hysterical and screamed: "Nickie, Nickie, Nickie" and "I am sorry. I didn't mean it Nickie." Officer Daly then placed appellee in the back of the patrol wagon. Several minutes into the ride from the hospital to the Police Administration Building, appellee began to chant a religious psalm and stamp her feet. Appellee maintained her chanting and stamping for approximately fifteen minutes. At about 11:30 A.M. in the Police Administration Building, Officer Kuhar attempted to obtain background information such as appellee's name, address and Social Security number. Appellee refused to answer. At about 12:45 P.M., Officer Kuhar attempted to read the *Miranda* warnings to appellee. She said she did not have to

2. Officer Branch testified that Officer Palma asked him if appellee was the mother and when he said yes, Officer Palma said, "the baby is dead." Appellee, who overheard the conversation, shouted "Oh, my God, I didn't mean to do it." The suppression court accepted Officer Branch's version while the trial court relied on Officer Palma's version. The discrepancy does not affect our result. *See* n. 6, *infra.*

hear or to answer them. Officer Kuhar asked her to read her rights and record her answers. She read them and wrote "yes" by question number 3, "Do you want to remain silent." Although Officer Kuhar did not question appellee, she spontaneously stated:

Elvita died 30th of May, 1976, between 4:00 and 4:30 P.M., 24th or 25th and Lehigh. I am Eve now. Bobby beat Elvita, beat her head. Elvita then left Bobby and became Eve. Today Nakia and Elvita are together in spirit. Eve put Nakia in spirit today.[3]

Subsequently, when appellee was taken before the Arraignment Court she suddenly stated that she was guilty and had killed her baby. She also told a matron she had killed her baby.

The suppression judge concluded that the police did not attempt to interrogate appellee and that finding is supported by the record. The suppression judge declined to suppress the appellee's spontaneous statements ruling they were volunteered and were not in response to any psychological or physical coercion by the police.[4] Moreover, the suppression judge concluded that since the police did not interrogate appellee, *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) did not require the officers to warn her of her Fifth and Sixth Amendment rights.

Appellee's spontaneous statements were admitted at trial. However, following her conviction, the trial judge granted her motion for a new trial on the ground that her spontaneous statements were involuntary and therefore should have been suppressed. The trial judge relied on testimony of Dr. Cooke, a defense psychiatrist, who testified at the suppression hearing that:

3. Officer Kuhar did not testify at trial and the Commonwealth did not introduce that statement at trial. Also, at about 11:35 A.M., in an effort to contact an attorney, appellee called a friend, Marguerita Clark. Police officers overheard her say she was in a trance and didn't mean it. Likewise, the Commonwealth did not attempt to introduce that statement at trial.

4. In fact, appellee does not contend her statement was elicited by any police conduct, improper or otherwise.

... [Defendant's] mental status ... was one of confusion, anxiety, hostility, delusions, hallucinations, anger, and that she could consistently experience directly contradictory ideas and feelings so that she was so confused that she could not make a logical determination: This is what I want to do; this is what I do not want to do. In the process of all that confusion, many statements would emerge, which taken as a totality, would indicate the contradictory kinds of feelings she has.[5]

The trial judge also considered trial testimony admitted to prove appellee's insanity, including evidence that appellee believed Nakia (her baby) had tried to kill her; Nakia had turned into an animal; appellee was the Messiah; appellee had baptized Nakia and sent Nakia's good part to heaven; and she now wanted to send Nakia's bad part to heaven. The trial court also considered testimony that appellee had a history of mental illness for two years prior to the killing and that she had experienced auditory and visual hallucinations and delusions during that period.

## I

Prior to *Miranda,* confessions were examined under the Due Process Clause of the Fifth and Fourteenth Amendments to the United States Constitution. The central concern in determining the admissibility of a confession or other statements of an accused was whether they may properly be viewed as voluntary, insofar as they were not elicited as the result of any pressure likely to overcome the confessor's will. *See* J. Cook, Constitutional Rights of the Accused, Trial Rights § 71 (1974). More specifically, the United States Supreme Court in its pre-*Miranda* cases considered voluntariness with respect to statements obtained from an individual

5. The suppression judge noted that Dr. Cooke also testified that a month after the killing appellee was "spontaneous", reasonably coherent, relevant and oriented as to time and place and person. At trial, in support of appellee's insanity defense, Dr. Cooke testified that appellee believed she was "doing right" when she killed her daughter since she thought she was following God's commands and making a sacrifice.

subjected to custodial police interrogation. The means employed by police to extract confessions were the traditional focus of concern. *See Commonwealth v. Willman,* 434 Pa. 489, 255 A.2d 534 (1969).

Initially, the United States Supreme Court held that the Due Process Clause prohibited the states from using an accused's confession compelled by means of torture. *Brown v. Mississippi,* 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936). In *Bram v. United States,* 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897) the United States Supreme Court, in determining whether a confession was voluntary, followed the Fifth Amendment's commandment that no person shall be compelled in any criminal case to be a witness against himself. The constitutional inquiry is:

[N]ot whether the conduct of state officers in obtaining the confession was shocking, but whether the confession was "free and voluntary; that is, [it] must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence. * * * ".

*Malloy v. Hogan,* 378 U.S. 1, 7, 84 S.Ct. 1489, 1493, 12 L.Ed.2d 653 (1964) (quoting *Bram v. United States,* 168 U.S. at 542–43, 18 S.Ct. at 187) (citations omitted).

Prior to *Miranda,* both this Court and the United States Supreme Court recognized that modern custodial interrogation is psychologically oriented and that coercion can be mental as well as physical. *See Miranda v. Arizona,* 384 U.S. at 448, 86 S.Ct. at 1614 (citing *Blackburn v. State of Alabama,* 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960); *Chambers v. Florida,* 309 U.S. 227, 60 S.Ct. 472, 84 L.Ed. 716 (1940)). *See also Commonwealth v. Jones,* 341 Pa. 541, 19 A.2d 389 (1941) (if defendant was compelled by reason of force, violence, threat or otherwise, or intimidation of any kind to make the statements, they are excluded as involuntary).

Pre-*Miranda,* in determining whether a confession following custodial interrogation was involuntary, the courts also considered the susceptibility of the accused to coercive influ-

ences including a suspect's age, *Commonwealth v. Hernandez,* 498 Pa. 405, 446 A.2d 1268 (1982); lack of education, *Chambers v. Florida, supra;* physical and mental condition, *Reck v. Pate,* 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948 (1961); *Commonwealth v. Hernandez, supra; Commonwealth v. Willman, supra; Commonwealth v. Holton,* 432 Pa. 11, 247 A.2d 228 (1968); the defendant's emotional instability and schizophrenia, *Fikes v. Alabama,* 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957); and probable insanity at the time of interrogation, *Blackburn v. Alabama, supra.* Our Court has summarized the standard for determining whether a statement made in response to custodial interrogation is voluntary:

> [t]he totality of the circumstances surrounding the statement must be examined, including: duration and methods of interrogation; the conditions of confinement; the manifest attitudes of the police toward the defendant; defendant's physical and psychological condition; and any other condition which may drain the defendant's power of resistance to suggestion or to undermine his ability to exercise free will. See *Culombe v. Connecticut,* 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961); *Commonwealth v. Kichline,* 468 Pa. 265, 361 A.2d 282 (1976).

*Commonwealth v. O'Bryant,* 479 Pa. 534, 539–40, 388 A.2d 1059, 1062 (1978), *cert. denied,* 439 U.S. 990, 99 S.Ct. 589, 58 L.Ed.2d 664 (1978).

However, the pre-*Miranda* voluntariness doctrine encompassed only "*interrogation practices* which are likely to exert such pressure upon an individual as to disable him from making a free and rational choice." *Miranda v. Arizona,* 384 U.S. at 464–65, 86 S.Ct. at 1622–23, (citing *Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964)) (emphasis added). *See also Haynes v. Washington,* 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963); *Malinski v. New York,* 324 U.S. 401, 65 S.Ct. 781, 89 L.Ed. 1029 (1945); *Ashcraft v. Tennessee,* 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192 (1944); *Lisenba v. California,* 314 U.S. 219, 62 S.Ct. 280, 86 L.Ed. 166 (1941). Thus, the issue which makes mental illness relevant

is whether the accused's will was overcome by overbearing and improper questioning. *See Commonwealth v. Hernandez*, 498 Pa. 405, 446 A.2d 1268 (1982); *Commonwealth v. Holton*, 432 Pa. 11, 247 A.2d 228 (1968).

■ Our interest in the individual's ability to make a rational choice in determining the voluntariness of a confession for constitutional purposes is "our strong conviction that our system of law enforcement should not operate so as to take advantage of a person" in a weakened condition, whether it is a physical or mental condition. *Commonwealth ex rel. Gaito v. Maroney*, 422 Pa. 171, 179, 220 A.2d 628, 632 (1966) (Roberts, J.) (quoting *Blackburn v. Alabama*, 361 U.S. at 207, 80 S.Ct. at 280). *See also In re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). In that light the purpose of the suppression hearing is to determine whether a confession resulting from custodial interrogation is coerced. That determination is to be uninfluenced by the truth or falsity of the confession. *See Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

## II

In *Miranda v. Arizona* the United States Supreme Court concluded procedural safeguards were necessary to protect a suspect from the inherently compelling pressures of *in-custody interrogations* "which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Id.* 384 U.S. at 467, 86 S.Ct. at 1624. In order to fully guarantee the Fifth Amendment privilege against self-incrimination:

He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, the individual may knowingly

and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him.

*Id.* at 479, 86 S.Ct. at 1630 (footnote omitted).

■■■ The *Miranda* warnings and concomitant determination whether a defendant has made a knowing and voluntary waiver of rights are now prerequisites to the admission of a confession only if an individual is "taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is *subjected to questioning.*" *Id.* at 478, 86 S.Ct. at 1630 (emphasis added).[6] *See Commonwealth v. Gardner,* 490 Pa. 421, 416 A.2d 1007 (1980) (failure to give defendant *Miranda* warnings does not bar admission of inculpatory statement which defendant volunteered prior to questioning). *See also* Anno. 31 A.L.R.3d 565, 676–96 (collecting cases).

Subsequent to *Miranda* this Court has reviewed statements obtained as a result of custodial interrogations to determine whether the defendant knowingly, intelligently and voluntarily waived his *Miranda* rights and whether defendant voluntarily gave the statement used at trial over his objection. *See Commonwealth v. O'Bryant, supra.*

**6.** Appellee does not contest the Commonwealth's assertion her statements were "volunteered" in the sense that they were not elicited by interrogation or its functional equivalent. Interrogation must reflect a measure of compulsion above and beyond that inherent in custody itself. Interrogation is defined as express questioning and "words or actions that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980) (footnotes omitted). Appellee does not contend nor did the trial court conclude that either Officer Palma's or Officer Branch's version of events in the Emergency Room was the functional equivalent of express questioning. *Compare Rhode Island v. Innis, supra* with *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977) and *Commonwealth v. Simala,* 434 Pa. 219, 252 A.2d 575 (1969). Moreover, asking general background questions such as name, address, age and occupation, marital status and religion does not constitute custodial interrogation within the meaning of *Miranda. See Commonwealth v. DuVal,* 453 Pa. 205, 307 A.2d 229 (1973).

However, the prerequisite for both inquiries remains a custodial interrogation. Thus, we have held a defendant's statements are admissible if:

> [N]ot made in response to police conduct "calculated to, expected to, or likely to evoke admissions." If the statement is "given freely and voluntarily without any compelling influences," it is admissible notwithstanding the lack of *Miranda* warnings. *Commonwealth v. Yount,* 455 Pa. 303, 309, 314 A.2d 242, 246 (1974), citing *Miranda, supra,* 384 U.S. at 478, 86 S.Ct. at 1629, 16 L.Ed.2d at 726. *Miranda* warnings are called for only if the police questioning constitutes interrogation; that is, likely or expected to elicit a confession or other incriminating statements. *See Commonwealth v. Simala, supra; Commonwealth v. Boone,* 467 Pa. 168, 354 A.2d 898 (1975); *Commonwealth v. D'Nicuola,* 448 Pa. 54, 292 A.2d 333 (1972). *Cf. Commonwealth v. McLaughlin,* 475 Pa. 97, 379 A.2d 1056 (1977).

*Commonwealth v. Sero,* 478 Pa. 440, 453, 387 A.2d 63, 70 (1978). *See also Commonwealth v. Simala,* 434 Pa. 219, 252 A.2d 575 (1969).

### III

The trial court's grant of a new trial in this case is based on its erroneous conclusion that statements of an accused are "involuntary" for purposes of the Fifth Amendment if they result from an internal compulsion to speak caused by mental illness, even in the absence of any conduct by the police reasonably likely to elicit a response from the accused. In so holding, the trial court relied on language in this Court's opinion in *Commonwealth v. Ritter,* 481 Pa. 177, 392 A.2d 305 (1978), *cert. denied,* 441 U.S. 913, 99 S.Ct. 2014, 60 L.Ed.2d 386 (1979) (*Ritter II*). In order to properly understand the meaning of *Ritter II* we must consider it in light of *Commonwealth v. Ritter,* 462 Pa. 202, 340 A.2d 433 (1975) (*Ritter I*).

In *Ritter I* this Court reversed a defendant's conviction of arson and voluntary manslaughter holding the suppression court erred in declining to suppress a confession which the

defendant made after one and one-half hours of police interrogation. Based on the following testimony, this Court concluded in *Ritter I* that his confession was involuntary:

Officer Soprano, testifying at appellant's suppression hearing, stated that after he initially spoke with appellant, he decided that appellant had a psychiatric problem and, in fact, tried to reach a psychiatrist prior to questioning appellant. In addition, the officer stated that during the course of the interrogation, appellant was whimpering, sobbing and "really looked tired." Moreover, the officer stated that appellant had not slept for three days prior to his interrogation. . . .

462 Pa. at 203–04; 340 A.2d at 433.

Following a remand, the Commonwealth introduced testimony that the defendant volunteered an alleged admission approximately twelve hours after the first confession. In *Ritter II* this Court stated:

The evidence presented by the prosecution at the suppression hearing preceding appellant's second trial did not indicate that any of the conditions which compelled us to suppress appellant's earlier statement to the state police officer had changed in such a way that would indicate that this subsequent statement was voluntary. In fact, the prosecution's evidence indicates the contrary; that appellant still had not had any rest, that he was "shaky" and "crying," apparently still suffering from the same psychological pressures that prompted the investigating state police officer to seek psychiatric aid for him.

481 Pa. at 181, 392 A.2d at 307. Consequently, *Ritter II* held the statements were involuntary. The trial court relied on the following language in *Ritter II* in support of its conclusion that a statement may be involuntary under the Due Process Clause in the absence of any interrogation by the police:

It is not relevant here that the statement ordered suppressed by us in appellant's first appeal was allegedly made in response to police questioning while the statement at issue in this appeal was supposedly "spontane-

ous." In ruling that appellant's earlier statement to the state police was involuntary, we stated that

"[T]he line of distinction [between a voluntary and involuntary confession] is that at which governing self-direction is lost and compulsion, of whatever nature or however infused, propels or helps to propel the confession." *Id.,* 462 Pa. at 204, 340 A.2d at 434 quoting from *Commonwealth v. Alston,* 456 Pa. 128, 317 A.2d 241 (1974). *Commonwealth v. Ritter,* 481 Pa. at 181, 392 A.2d at 307.

■ In *Alston* and the cases cited therein the defendants were subjected to interrogation prior to the confession. While internal elements impinging upon a defendant's will such as his physical and psychological condition may render a confession which follows interrogation involuntary, neither the Pennsylvania nor the United States Constitution protect a defendant from statements which originate entirely from internal compulsion resulting from a mental disease. A compulsion to confess does not make the resulting confession inadmissable. We hold today that *Ritter II* stands only for the proposition that after the police have elicited an "involuntary" confession by interrogation from an obviously mentally ill defendant, subsequent statements which were influenced by or flow from the earlier interrogation may be involuntary even in the absence of further interrogation.

## IV

■ Our standard of review in this case is limited to determining whether the factual findings of the suppression court are supported by the record and whether the legal conclusions drawn therefrom are in error. *Commonwealth v. Webb,* 491 Pa. 329, 421 A.2d 161 (1980). We hold the record supports the suppression court's finding of fact that the police did not interrogate appellee and his conclusion of law that, as a result, her statements were voluntary within the context of the Fifth and Fourteenth Amendment.[7] That

7. Because the suppression judge concluded that her statements were not in response to interrogation, he stopped short of concluding appellee was incapable of waiving her constitutional rights. He did

finding was correct despite the fact that two of her inculpatory statements were made after *Miranda* warnings were given and she had elected to remain silent. It is well established that a statement which is spontaneously volunteered is admissible notwithstanding a prior assertion of constitutional rights. *Commonwealth v. Scarborough,* 491 Pa. 300, 421 A.2d 147 (1980). The trial judge erred in reversing the suppression judge's conclusion based on evidence purportedly unavailable at the suppression hearing, since that evidence was not relevant to the finding that the police did not interrogate appellee.[8] The additional evidence presented at trial related to appellee's mental condition at the time she volunteered her statements. Such evidence is relevant to an inquiry into her competence to make reliable admissions not to the issue of improper interrogation. *See* Part V, *infra.*

## V

■ Defense counsel's objections to the admission of appellee's statements arguably included the alternate ground that they were inadmissible for testimonial incompetency. *See Commonwealth v. Mozzillo,* 443 Pa. 171, 278 A.2d 874 (1971). The trial court opinion does not clearly place any reliance on this alternate ground and appellee does not argue the competency issue here. However, as the dissent correctly concludes, the Commonwealth offered appellee's statements not to establish the truth of their content but as circumstantial evidence of her mental condition. Consequently, testimonial trustworthiness was not in issue and her

conclude, however, that appellee knew what she was doing despite evidence of her history of hallucinations. While we need not resolve that question here, we note that a person with mental illness including a history of hallucinations and delusions may be capable of waiving her constitutional rights. *See Commonwealth v. Tucker,* 461 Pa. 191, 335 A.2d 704 (1975); *Commonwealth v. Neely,* 298 Pa.Super.Ct. 328, 444 A.2d 1199 (1982).

8. Pa.R.Crim.P. Rule 323(j) provides *inter alia:* "If the court determines that the evidence shall not be suppressed, such determination shall be final, conclusive and binding at trial, except upon a showing of evidence which was theretofore unavailable. . . . "

statements were properly admitted for the purpose for which they were offered. *See Commonwealth v. England,* 474 Pa. 1, 13–14, 375 A.2d 1292, 1298–99 (1977); *Commonwealth v. Wright,* 455 Pa. 480, 486, 317 A.2d 271, 274 (1974). *See also* 6 J. Wigmore, Evidence § 1790 (Chadbourn rev. 1976).

Appellee's post-trial motions included a motion in arrest of judgment on the ground that the Commonwealth's evidence was insufficient to prove her sanity beyond a reasonable doubt. However, appellee failed to exercise her right to cross-appeal from the trial court's denial of that motion in arrest of judgment and did not address the issue in this Court. *See* Pa.R.A.P. 311(a)(5). The trial court did not discuss the issue in its opinion and neither the defendant nor the Commonwealth briefed or argued the issue here. Thus, in raising and deciding the sufficiency issue the dissent violates the sound rule against a court's *sua sponte* raising issues not properly placed before it by the litigants. *See Weigand v. Weigand,* 461 Pa. 482, 337 A.2d 256 (1975). Following that rule we decline discussion of the sufficiency issue.

Because it granted a new trial based on its conclusion that appellee's statements were involuntary, the trial court failed to consider defendant's additional reasons for a new trial. Consequently, the order of the Philadelphia Court of Common Pleas granting a new trial is vacated and the record is remanded to that Court for further consideration of the reasons advanced by appellee in support of her motion for a new trial, and disposition of that motion.

NIX, J., files a dissenting opinion in which ZAPPALA, J., joins.

NIX, Justice, dissenting.

The delusional utterances of an unquestionably ill individual should not be admitted generally as substantive evidence of the guilt of that person of the crime charged. *See Commonwealth v. Ware,* 459 Pa. 334, 329 A.2d 258 (1974); *Commonwealth v. Mozzillo,* 443 Pa. 171, 278 A.2d 874 (1971).

The only purpose such evidence can legitimately serve, at the adjudicative stage, is to reflect upon the mental state of the actor when that is in question. *Commonwealth v. England,* 474 Pa. 1, 375 A.2d 1292 (1977); *Commonwealth v. Demmitt,* 456 Pa. 475, 321 A.2d 627 (1974); *Commonwealth v. Zlatovitch,* 440 Pa. 388, 269 A.2d 469 (1970); *Commonwealth v. Williams,* 307 Pa. 134, 160 A. 602 (1932). A reading of the charge does not satisfy me that this distinction was clearly made to the jury and on that basis alone a new trial is justified. A reading of the charge as a whole as we must, *Commonwealth v. Wortham,* 471 Pa. 243, 369 A.2d 1287 (1977), indicates the jury may have used Ms. Bracey's statement as support for their finding that she in fact caused her child's death as well as a basis for assessing her mental state at the time. The latter is permissible, *Commonwealth v. England, supra; Commonwealth v. Demmitt, supra; Commonwealth v. Zlatovitch, supra; Commonwealth v. Williams, supra,* but the former clearly is not. *Commonwealth v. Ware, supra; Commonwealth v. Mozzillo, supra.*

Of even more significance is that the post-verdict court has ruled adversely upon appellee's motion in arrest of judgment. This motion was predicated upon appellee's claim that the Commonwealth failed to establish her sanity at the time of the killing beyond a reasonable doubt. *Commonwealth v. Tempest,* 496 Pa. 436, 437 A.2d 952 (1981); *Commonwealth v. Green,* 493 Pa. 409, 426 A.2d 614 (1981); *Commonwealth v. Scarborough,* 491 Pa. 300, 421 A.2d 147 (1980); *Commonwealth v. Reason,* 485 Pa. 450, 402 A.2d 1358 (1979); *Commonwealth v. Hubbard,* 485 Pa. 353, 402 A.2d 999 (1979); *Commonwealth v. Tyson,* 485 Pa. 344, 402 A.2d 995 (1979); *Commonwealth v. Hicks,* 483 Pa. 305, 396 A.2d 1183 (1979); *Commonwealth v. Delker,* 467 Pa. 305, 356 A.2d 762 (1976); *Commonwealth v. Moyer,* 466 Pa. 464, 353 A.2d 447 (1976); *Commonwealth v. Bruno,* 466 Pa. 245, 352 A.2d 40 (1976); *Commonwealth v. Williams,* 463 Pa. 370, 344 A.2d 877 (1975); *Commonwealth v. Rose,* 457 Pa. 380, 321 A.2d 880 (1974); *Commonwealth v. Demmitt, supra.* Since the remand of the majority is limited to the remaining issues in

appellee's motion for a new trial on post-verdict motions, it would appear that this Court has affirmed the denial of the motion in arrest of judgment. This claim has considerable merit and should not be dismissed without explanation by either the court below or this Court.[1]

1. I cannot accept the majority's view that Ms. Bracey's failure to exercise her right to an interlocutory cross-appeal from the trial court's denial of her motion in arrest of judgment amounts to a waiver of the sufficiency issue. Such a finding is clearly impermissible. It must be noted initially that Pa.R.A.P. 311, which permits a criminal defendant to take such an appeal, see Pa.R.A.P. 311(a)(5), explicitly states that a defendant's failure to do so does not constitute a waiver of the issues which could have been raised at that stage of the criminal proceedings. Pa.R.A.P. 311(d)(1)(i) provides:

> **(d) Waiver of objections**
>
> (1) where an interlocutory order is immediately appealable under this rule, failure to appeal:
>
> (i) under *subdivision (a) or subdivision (b)(2) of this rule shall not constitute a waiver of the objection to the order* and the objection may be raised on any subsequent appeal in the matter from a determination of the merits. (Emphasis added.)

Thus, under the rules of this Court, Ms. Bracey did not waive her sufficiency claim by failing to take a cross appeal.

Moreover, even in the absence of Pa.R.A.P. 311(d)(1)(i), Ms. Bracey's failure to appeal cannot operate as a waiver of her right to appellate review of her sufficiency claim. It is well established that the right to appeal is a personal right which may be relinquished only through a knowing, voluntary and intelligent waiver. *Fay v. Noia,* 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963); *Commonwealth v. Clayton,* 496 Pa. 492, 437 A.2d 1147 (1981); *Commonwealth v. Cathey,* 477 Pa. 446, 384 A.2d 589 (1978); *Commonwealth v. Jones,* 447 Pa. 228, 286 A.2d 892 (1971); *Commonwealth v. Maloy,* 438 Pa. 261, 264 A.2d 697 (1970); *Commonwealth ex rel. Robinson v. Myers,* 427 Pa. 104, 233 A.2d 220 (1967); *Commonwealth ex rel. Edowski v. Maroney,* 423 Pa. 229, 223 A.2d 749 (1966). Under *Douglas v. California,* 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963), the trial court must advise the defendant of his right to appeal and, if he is indigent, of his right to court-appointed counsel on appeal. *Commonwealth v. Brown,* 488 Pa. 320, 412 A.2d 529 (1980); *Commonwealth v. Morris,* 486 Pa. 391, 406 A.2d 337 (1979); *Commonwealth v. Walker,* 460 Pa. 658, 334 A.2d 282 (1975); *Commonwealth v. Mack,* 451 Pa. 319, 304 A.2d 93 (1973); *Commonwealth v. Stewart,* 435 Pa. 449, 257 A.2d 251 (1969); *Commonwealth v. Sapp,* 428 Pa. 377, 238 A.2d 208 (1968); see Pa.R.Crim.P. 1123(c), 1405(b). The record indicates that Ms. Bracey was advised of her right to file post-verdict motions, which she exercised. However, the trial court did not thereafter conduct an on-the-record colloquy to advise Ms. Bracey of her right to appeal that court's decisions on her post-verdict motions. Thus, on this record, the sufficiency issue cannot be considered waived.

In evaluating the sufficiency of the evidence presented by the Commonwealth to prove sanity, we must view such evidence in the light most favorable to the Commonwealth as verdict winner. *Commonwealth v. Metzler*, 499 Pa. 122, 451 A.2d 1352 (1982); *Commonwealth v. Tempest, supra; Commonwealth v. Green, supra; Commonwealth v. Hicks, supra.* So viewed, the evidence adduced in the instant case was clearly insufficient to prove appellee's sanity beyond a reasonable doubt.

A. *Evidence Establishing The Existence of Mental Illness Prior to March 28, 1978.*

The undisputed facts clearly demonstrate a long history of mental illness prior to Easter Sunday, March 28, 1978, when

In general, the remedy this Court has afforded in situations where the trial court has failed to advise a defendant of his rights is the return of the proceedings to the stage at which the defect occurred. *See, e.g., Commonwealth v. Cathey, supra; Commonwealth v. Kulp,* 476 Pa. 358, 382 A.2d 1209 (1978); *Commonwealth v. Miller,* 469 Pa. 370, 366 A.2d 220 (1976); *Commonwealth v. Tyler,* 468 Pa. 193, 360 A.2d 617 (1976); *Commonwealth v. Williams,* 454 Pa. 368, 312 A.2d 597 (1973). In the instant circumstances, however, no purpose would be served by remanding a matter already before us on appeal. *Cf. Commonwealth v. Hall,* 430 Pa. 163, 242 A.2d 241 (1968). First, the trial court has already ruled on Ms. Bracey's motions. Thus no further action is required of that court. Second, since there is no need for additional testimony, the record after remand would be identical to the one presently before this Court. The issue of the sufficiency of the evidence is thus ripe for our decision. To remand for the filing of a notice of appeal would be an empty ritual.

The only remaining question is whether it is appropriate to consider the sufficiency issue *sua sponte* at this point. If the sufficiency claim were to prevail on appeal, retrial would be barred by the Double Jeopardy Clause. *See Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); *Commonwealth v. Vogel,* 501 Pa. 314, 461 A.2d 604 (1983); *Commonwealth v. Meadows,* 471 Pa. 201, 369 A.2d 1266 (1977). Yet, should this Court refuse to consider that claim now, Ms. Bracey would be precluded from interposing a double jeopardy claim in the event the trial court awards a new trial on her remaining motions. Thus, she would be forced to undergo a second prosecution even though her claim that she was entitled to an acquittal may be meritorious. Once she is subjected to retrial, no relief will be capable of vindicating her basic constitutional right not to be placed twice in jeopardy. Only by considering the sufficiency issue now can we prevent this potential injustice. *See Commonwealth v. Bolden,* 472 Pa. 602, 373 A.2d 90 (1977).

this incident occurred. At that time, Nakia, appellee's daughter, was three years of age. Nakia's father, Bobby Little, maintained an unsteady relationship with appellee during the period in question.

The first indication of mental illness reflected in the record occurred in May of 1976. On that occasion Ms. Bracey informed her sister that people were chasing her and trying to kill her. As a result of this behavior, appellee's family took her to the Crisis Center of Temple University Hospital. The hospital records indicate that appellee was then experiencing auditory hallucinations and was diagnosed as schizophrenic, paranoid type. Appellee was given medication and released.

Later in 1976, Bobby Little and another friend again took appellee to the hospital because of mental problems. On that occasion, appellee refused to stay, giving as a reason that people on motorcycles were waiting outside to harm her. Bobby Little testified from that time appellee would occasionally get depressed or paranoid requiring medication. For example, during this period she on one occasion expressed the belief that people on the street were trying to kill her.

Appellee continued to periodically receive medication and to experience acute episodes. Medical records reflect that both in May and July, 1977 appellee required emergency treatment (including in-patient care) at the Crisis Center. During February of 1978, appellee again began to manifest paranoia. She stated to her sister that Nakia was acting in a strange manner and looked as though she had been transformed into a wolf. She also stated to a cousin that Nakia's father and his family were attempting to turn Nakia against her.

In March 1978 her conduct became increasingly bizarre. She stated to people that her name was Eve and that she was the Lord's messenger. In the early part of March, Bobby Little went to appellee's home where he observed appellee conducting a pseudo-religious ceremony in which she claimed to be a nude Christ. During this time appellee

also kept a sunlamp in her home and told a number of people that if that lamp ever went out, the world would end.

She was again taken to the Crisis Center on March 11, 1978. The records of that visit indicate that appellee complained of auditory and visual hallucinations and that she was experiencing feelings of paranoia. Appellee was provided with medication and again sent home. On March 13, 1978 appellee refused to consent to any further treatment at the Crisis Center. On that date she stated to her sister that Nakia had taken knives and forks and hidden them throughout the house.

Because of the alarming increase in the intensity of her bizarre behavior and her resistance to medical help, appellee's family had unsuccessfully attempted to have her committed to Friends Hospital. The commitment petition included a statement that appellee had started a fire in a pan which she placed in the middle of the floor in order to drive evil spirits from her home, and then climbed out on the roof of the dwelling wearing neither coat nor shoes. The petition also recited appellee's claims of hearing voices and of her refusal to receive treatment or to take medication. After confinement for a period of seventy-two (72) hours at the Crisis Center of North Central Philadelphia Community Mental Health/Mental Retardation Center, she was discharged by court order on March 16, 1978. During that commitment, the hospital records reflect that appellee claimed various articles of furniture had been flying around in her room.

Following her release from the involuntary commitment, appellee continued to exhibit bizarre conduct. During a visit to appellee's home between March 16, 1978 and the date of the killing, appellee's sister observed that appellee had arranged a Bible, a photograph album, a cross, a crystal ball, a scorpio and a witchcraft book on the floor of her living room. Ms. Bracey explained that she was employing the objects in her prayers to save her baby, Nakia. On the Sunday one week before the date of the killing, appellee stated to Bobby Little that Nakia had grown bigger and had

attempted to kill her. She also stated that Nakia had turned into an animal.

During the week immediately preceding March 28, Ms. Bracey stated to her cousin that her daughter, Nakia, was possessed and that whenever Nakia had in her possession a knife or a fork, she would attempt to stab appellee. During this same time span appellee's brother observed Ms. Bracey carrying a shopping bag containing a crystal ball, a Bible and a witchcraft book. Her brother further testified that during the days immediately preceding March 28, it was necessary for him personally to take Ms. Bracey to receive psychiatric treatment on three separate occasions.

B. *Evidence Establishing Mental Illness at The Time of The Incident*

During the Saturday before Easter, appellee was in the company of Bobby Little. Although her behavior appeared normal in the early part of the day, towards evening her medication began to lose its effect and Ms. Bracey's behavior became erratic. She told Little that she was the Messiah, that she had baptized Nakia and sent the baby's good part to heaven, and that she now wanted also to send the baby's bad part to heaven. Little left appellee's home at approximately midnight. Nakia was at this time staying at the home of Little's mother, which is where the child usually stayed during the times that appellee was experiencing difficulties.

The next morning (March 28) Mrs. Little informed her son that during the night appellee had taken Nakia from the Little residence. Becoming alarmed because of appellee's mental state, Little went immediately to appellee's home. Appellee refused to admit Little and told him he could not take the child because appellee was performing a ritual for her. Appellee then brought the child to the front door and held her up for Little to see. At this time, both appellee and her child were nude. Little attempted to force his way into the house and appellee stabbed him in the hand in repelling him. Subsequently, appellee ran from the house nude.

Little entered the home after appellee left and found Nakia lying in the center of the floor of the living room. Also lying on the floor was a Bible, a book entitled *Helping Yourself to White Witchcraft,* a photograph album, a key chain, a cross, several pieces of jewelry, a crystal ball, a bracelet, a hound's tooth, spirits of peppermint, and a copy of the lyrics to a popular song. Nakia had sustained two stab wounds which resulted in her death.

Several police officers observed appellee running naked down the street. When one of the officers attempted to stop her, she screamed and continued running. She was finally apprehended in a house four and one-half blocks away. At this point appellee was nude except for a set of beads.

Appellee was taken to the hospital where she became hysterical, "screaming and yelling and banging her hands on the floor," and had to be calmed and seated by the officers. She then was transported by police vehicle to the Police Administration Building. During the ride, which lasted approximately 15 minutes, appellee began chanting religious psalms and stomping her feet. During the administrative questioning at police headquarters, appellee had to be restrained on several occasions from removing her clothing. Throughout the entire period she was incoherent and contradictory.

## C. *Conclusion*

In addition to this uncontroverted testimony of a serious mental illness prior to and at the time of the killing, the irrational circumstances of the killing, her confused, anxious, and delusional state at the time of the arrest, all of the medical evaluations subsequent to her apprehension, with a single exception, would conclusively demonstrate that Ms. Bracey was legally insane on March 26, 1978. After a court ordered psychiatric examination, conducted by a psychiatrist and psychologist, she was declared incompetent on April 19, 1978 and committed to Byberry for a period of ninety (90) days under the Mental Health Procedures Act, Act of July 9,

1976, P.L. 817, No. 143, § 101 *et seq.,* 50 P.S. § 7101 *et seq.* (Supp.1981–82).

Dr. Cooke, a forensic psychologist who examined her while she was in custody found her to be delusional.[2] She believed she had died and was reincarnated as Eve. She believed the sun spoke to her and that she had the power to control the sun. She believed that she had a mission to "lead your people home." She thought she was an angel sent to announce the end of the world. The doctor also found her to be paranoid. She thought people were speaking in unknown tongues; that they were practicing witchcraft and could read her thoughts; anyone nice to her would be hurt; and that people, including her attorney, were working against her. Dr. Cooke testified that Ms. Bracey said she would be reunited with her baby and it would benefit the world and it was God's wish that her baby be sent to heaven as sacrifice.

Dr. Cooke diagnosed Ms. Bracey as a chronic schizophrenic, paranoid type and concluded that she "was legally insane because she did not know the quality of the act, and felt that what she was doing was right."[3] In spite of seventy-

---

2. Dr. Cooke is a clinical psychologist specializing in forensic psychology. He earned a Ph.D. in clinical psychology in 1966 from the University of Iowa. In 1973 he became Chief Forensic Psychologist at the Norristown State Hospital. He is on the faculty of the University of Pennsylvania, Continuing Education Program where he lectures on forensic psychology and also on the faculty of Temple University. In his position at Norristown he has examined some two or three thousand mentally ill patients charged with crimes. He also trains psychiatric residents and psychological interns. He is a consultant at Graterford Prison and Camp Hill, a state correctional institution housing juveniles. He has published twenty-three papers in professional journals, book chapters and has testified on criminal responsibility at least ten times.

3. Based upon his examination of Ms. Bracey and her medical history including diagnosis and treatment, Dr. Cooke concluded:
   Q. Doctor, based upon your psychological evaluation of Miss Bracey, do you have an opinion that you hold to a reasonable degree of scientific certainty regarding whether Miss Bracey on March the twenty-sixth, [sic] 1978, understood the nature and quality of her actions, and understood that what she was doing was wrong?
   A. I do have an opinion yes.
   Q. And what is that opinion?

one (71) pages of cross-examination, Dr. Cooke remained firm in this view.

Dr. Robert Sadoff, a forensic psychiatrist was equally firm in the view that Ms. Bracey was legally insane.[4] He personally examined Elvita Bracey twice: April 6, 1978 at City Hall and June 7, 1978 at Byberry. He requested Dr. Cooke to do additional testing. The direct examination of Dr. Sadoff culminated with the following:

Q. Doctor, based upon your examination in this case, including all other materials available to you, do you hold an opinion as to a degree of medical certainty regarding whether Elvita Bracey, at the time she committed the acts on Easter Sunday was aware of the

A. Well, as the law has stated, it has three parts to the nature of the act; the quality of the act and whether or not she knew what she was doing was wrong, and my understanding is that if any one part of that is compromised, then the individual is not responsible under the M'Naghten rule. I thought that she did know the nature of her act. That is, she knew on a very concrete basis she was going to inflict damage, if not death on the individual, on the baby, but it is my opinion—and I think there is a consistency with that of the court other, [sic] in believing that she did not know the quality of her act.

That is, that she believed that what she was doing was right, that in her mind the quality was not so much killing, that it was, instead, a matter of following God's commands, and making a sacrifice, reuniting spirits, doing something good for the world. And so that while she knew, on a concrete level, that there was a killing involved, she also felt that what she was doing was right, and that God's command had to be followed.

Q. Alright.

4. Dr. Sadoff formerly taught at Temple Law School and the Medical School. He is now Associate Professor of Clinical Psychiatry at the University of Pennsylvania and lecturer in law at Villanova University School of Law. He has two Board certifications: one in psychiatry from the American Board of Psychiatry and Neurology in 1967 and one in forensic psychiatry from the American Board of Forensic Psychiatry, Inc. in 1978. He has published many papers in national journals of law and medicine or psychiatry and has written three books, *Forensic Psychiatry, A Practical Guide for Lawyers and Psychiatrists,* (1975); co-author of *Psychic Injuries* (1975) and *Violence and Responsibility* (1978). He has examined for the M'Naghten legal insanity issue on several hundred occasions. He has been an expert witness on matters pertaining to mental responsibility in state and federal courts.

nature and quality of those acts and what she was doing wrong?

A. Yes, I have an opinion.

Q. And that question is referred to the McNaughton issue; is that correct?

A. Yes, it is.

Q. All right. What is your opinion on that issue?

A. My opinion is that she has had a chronic psychotic illness which preceded that day and was existing on that day, in my opinion, in a blatant psychotic form, and on the basis of her psychoses, her delusional system, her hallucinations and her distorted thinking, Elvita Bracey, at the time that she stabbed her daughter knew the nature of what she was doing. The nature is, I take a knife. I have to go to the drawer to get it and I plunge it into a baby.

The quality of the act is what she did not know. Quality of the act for me is that, did she know she was killing her daughter? Did she know what the consequences of her action were and in the context of the reality situation?

Sunday morning, her apartment, Easter Sunday. In my opinion, her delusions and her hallucinations so affected her judgment and her behavior that it was her belief that she was killing a bedeviled child who had been given the devil by Bobby Little's family and that she firmly believed, because of her delusional system, that Bobby Little was going to come in and kill her and take the baby away, and that also led to her not knowing the full quality of her act in killing her daughter.

And did she know there is a law against killing? Yes, she knows there's a law against killing. Did she believe at the time she stabbed her daughter and killed her she was doing wrong? By breaking the law she knew she was doing wrong.

But wrong also for her, at that time, meant that, "I am killing the devil. My daughter has the devil in her and needs to be exorcised. He will come in and prevent me

from getting the devil out of her. I must handle it this way."

And for that reason she did not believe at the precise time that she stabbed her that she was doing something morally wrong.

Dr. Sadoff's diagnosis that Ms. Bracey suffers from schizophrenia, paranoid type was described as a life-long diagnosis. He maintained the diagnosis through forty-eight (48) pages of cross-examination.

The diagnosis is a life-long diagnosis. She has had it for years prior to that Easter Sunday and probably the beginnings of it were even before 1976, but the first outward manifestation that I am aware of happened when she heard the voices and believed that she was the messenger of God.

She continues to hold that diagnosis, . . . which means she is blatantly psychotic or overtly crazy, . . . .

Appellee also placed into evidence her medical records which contained the following diagnoses or impressions from eight (8) psychiatrists who had seen and evaluated her:

| | | |
|---|---|---|
| Philip Katz, D.O. | June 22, 1976 | Schizophrenia, paranoid type |
| Chager, M.D. | July 2, 1977 | Paranoid type |
| Chager, M.D. | March 11, 1978 | Paranoid state |
| Turner A. Johnson, M.D. | March 11, 1978 | Paranoid state |
| L. Bird, M.D. | March 13, 1978 | Paranoid. . . |
| (Indecipherable) | March 15, 1978 | "There is no making of sense of this unless she is hospitalized. I can recommend nothing other." |
| Milton L. Bluett, M.D. | March 15, 1978 | Manic depressive illness, manic type |
| Alex vonSchlichten, M.D. | April 17, 1978 | Chronic schizophrenic illness, paranoid in nature |
| Muthaiya P. Krishnaraz, M.D. | Aug. 11, 1978 | Schizophrenia, paranoid type |

The single exception in this record to this overwhelming evidence supporting a finding of legal insanity was the testimony of Dr. Kenneth Kool, a psychiatrist called by the prosecution. Dr. Kool did not conduct a personal evaluation of Ms. Bracey nor did he hear the testimony of the various witnesses. His answers were in response to a hypothetical question twenty-eight (28) pages in length consisting of selected portions of evidence. Ms. Bracey's prior hospitalizations, previous diagnosis, and medications were not included in the hypothetical question. Although conceding appellee's mental illness, Dr. Kool maintained that she was legally sane and in touch with reality.[5]

With due deference to Dr. Kool's competence, I believe the following excerpt from the record, which reflects the concluding question put to Dr. Kool on cross-examination and his response, and the subsequent redirect examination is most informative.

Q. Doctor, if Miss Bracey had a Bible, a witchcraft book, a picture book, a Scorpio ball, a charm, some weeds burning in a little hub cap and she and her daughter were naked except for jewelry, and Miss Bracey were performing some kind of ritual that she perceived as necessary to free her daughter of the possession and the evil spirits that possessed her, would you say she was in touch with reality?

A. Yes.

MR. SCUTTI: Thank you. I have no further questions.

---

REDIRECT EXAMINATION

---

BY MR. LUNKENHEIMER:

Q. Why?

A. Because ritual religion has been with us as long as the recorded history of mankind, and religion and ritual are

---

5. Dr. Kool concluded that Ms. Bracey suffered from schizophrenia, schizo-affect type, with prominent paranoid features.

more prominent now than ever in the history of mankind, because there are more people on the face of the earth than ever in the history of mankind, and all of these religious articles and all of these things mentioned are easily available at any store.

Religious things and ritual and exorcism does not equal psychosis.  Does not equal insanity.  Does not equal schizophrenia.  People who do these things, you don't say, therefore, they are nuts or they are crazy.  It doesn't equal mental illness.

Q. There is exorcism in the Catholic Church;  is that correct?

A. I believe so.

In light of the above, I am firmly of the belief that the Commonwealth failed to carry its burden of establishing sanity beyond a reasonable doubt.  Therefore, I would reverse the order of the Court of Common Pleas dismissing the motion in arrest of judgment and discharge appellee as to the criminal charges.  The cause then should be remanded to the trial court to determine the proper disposition of Ms. Bracey under the provisions of the Mental Health Procedures Act, Act of July 9, 1976, P.L. 817, No. 143, § 101 *et seq.*, 50 P.S. § 7101 *et seq.* (Supp.1981–82).

ZAPPALA, J., joins this dissenting opinion.