**Commonwealth v. Rolf**

*Susan Moser, assistant district attorney,* for Commonwealth.

*MaryJean Glick, senior assistant public defender,* for defendant.

ASHWORTH, *J.*, April 7, 2009—Chad Andrew Rolf has filed a direct appeal to the Superior Court of Pennsylvania from his judgment of sentence imposed on December 4, 2008, as finalized by the court's denial of his post-sentence motion on January 26, 2009. This opinion is written pursuant to Rule 1925(a) of the Pennsylvania Rules of Appellate Procedure.

## I. BACKGROUND

On September 25, 2006, defendant was arrested and charged with arson, burglary and risking catastrophe[1] in connection with a fire that occurred at the Holy Trinity Lutheran Church[2] parsonage at 167 East Main Street in Ephrata, Pennsylvania on September 25, 2006. An omnibus pretrial motion was filed on May 1, 2007 and an addendum was filed on February 7, 2008. A suppression hearing was held on these motions on September 8, 2008, immediately prior to trial. At that time, the motions were denied in their entirety. (N.T., suppression hearing at 82.) The case proceeded to trial and concluded on September 12, 2008, with a jury verdict of guilty on all counts. Following the guilty verdict, the court ordered a pre-sentence investigation report.

On December 4, 2008, defendant received an aggregate sentence of three and one-half to 10 years incarceration in a state correctional institution.[3] (N.T., sentenc-

---

1. 18 Pa.C.S. §3301(a)(1)(i), 18 Pa.C.S. §3502(a), and 18 Pa.C.S. §3302(b), respectively.

2. The church was also identified in the record as the "Evangelical Lutheran Church of the Holy Trinity."

3. Defendant was sentenced to three and one-half to 10 years on the arson charge. He received a concurrent sentence of one to two years

ing at 33-34.) The court set restitution at $463,508.75 for the subrogation amount claimed by the insurance company for Holy Trinity Lutheran Church,[4] and $11,551.19 for the workers' compensation lien for medical expenses incurred by a firefighter injured while fighting the fire set by defendant. (*Id.* at 25-26.)

Defendant filed a timely post-sentence motion to vacate the jury verdict as against the weight of the evidence or, alternatively, to reduce defendant's prior record score and modify the sentence. This motion was denied by order and opinion dated January 26, 2009. A timely appeal to the Superior Court of Pennsylvania was filed on February 24, 2009.

Pursuant to this court's directive, appellant furnished a statement of error complained of on appeal which raised four issues: (1) the trial court erred in denying defense counsel's motion to suppress appellant's statements to the police; (2) the trial court erred in determining that appellant's prior record score was two; (3) the trial court erred in denying defense counsel's request for a restitution hearing; and (4) the jury's verdict of guilty of arson, burglary, and risking catastrophe were against the weight of the evidence. The Commonwealth filed a timely response to appellant's statement on March 30, 2009.

---

for the burglary. The sentence of risking a catastrophe merged with the arson.

4. The church waived its right to a claim of restitution of the $1,000 deductible. (N.T., sentencing at 25.)

## II. DISCUSSION

### A. *Denial of Suppression Motion*

Initially, appellant contends that the trial court erred in not suppressing his statements to the police which were allegedly the product of custodial interrogation. (See appellant's statement of errors at ¶1.) Where a motion to suppress has been filed, the burden is on the Commonwealth to establish by a preponderance of the evidence that the challenged evidence is admissible. Pa.R.Crim.P. 323(h); *Commonwealth v. Ruey,* 586 Pa. 230, 239-40, 892 A.2d 802, 807 (2006). It is the province of the suppression court to make findings of fact and conclusions of law as to whether evidence was obtained in violation of an accused's constitutional rights. *Commonwealth v. Nester,* 443 Pa. Super. 156, 160, 661 A.2d 3, 4 (1995).

The appellate court is bound by the suppression court's findings of fact if those findings are supported by the record and will reverse the suppression court only if the legal conclusions drawn from those facts are in error. *Commonwealth v. Schwing,* 964 A.2d 8, 11 (Pa. Super. 2008). Thus, if sufficient evidence is of record to support the suppression court's ruling and that court has not misapplied the law, the appellate court will not substitute its credibility determination for that of the suppression court judge.

Here, appellant argues that his inculpatory statements to the police were the result of custodial interrogation by the police where they failed to apprise him of his *Miranda* rights. This court determined, based upon the testimony at the hearing, that the initial brief inquiries of

appellant regarding the alleged threats being made against him did not, under the totality of the circum- stances, amount to custodial interrogation.

The testimony at the suppression hearing established the following facts. At approximately 2:24 a.m. on September 25, 2006, members of the Ephrata Police Department were summoned to the Holy Trinity Lutheran Church parsonage for a structure fire. (N.T., suppression at 28.) At 2:55 a.m., the Ephrata Police received a "threat's call" from Lancaster County Dispatch which advised that the reporting person was at the Ephrata Police Station using the outside contact phone.[5] (*Id.* at 6.) Officer Brandon Bartholomew, who was actively involved in the fire scene with evacuating residents from adjacent buildings, advised County Dispatch that he would respond back to the "threat's call" as quickly as possible. (*Id.* at 6-7.)

Upon his arrival at the station at approximately 3:41 a.m., Officer Bartholomew saw appellant Chad Rolf[6] sitting on the ground outside. (N.T., suppression at 7-8, 21.) Appellant was observed wearing shorts, and his right pants' leg had a burn mark on it. (*Id.* at 8, 10, 24; see also, 27, 30, 37.) Appellant was smoking Newport cigarettes and he had a pack of matches with him. *(Id.)*

---

5. There is a monitor on the wall next to the outside entrance to the Ephrata Police Station. If you press the button, it rings in the police station. If no one is there to answer the call, it is transferred to 9-1-1 county dispatch. (N.T., suppression at 9.) This is what happened in the instant case.

6. Officer Bartholomew was able to immediately identify the appellant as he had attended Ephrata High School with him. (N.T., suppression at 10, 24.)

Almost immediately thereafter, Officer Paul Moore had also arrived back at the station. (N.T., suppression at 10, 26.) Appellant proceeded to tell the officers that there were approximately 20 people from the Mafia or mob after him who wanted to harm him because of an unpaid debt. (*Id.* at 11, 22, 28, 35.) Appellant also explained to the police that his car, which was parked around the corner at the Ephrata Flea Market, was "bugged." (*Id.* at 11, 23, 35-36.) Appellant indicated that he would like to be in police custody as it would be safer for him than being out in public. (*Id.* at 28, 37-38.) Appellant further related that the dispatcher told him that *his* church, the Holy Trinity Lutheran Church, was on fire. (*Id.* at 11, 31.) Appellant later recanted this statement and explained that the dispatcher did not tell me that the church was on fire but that he just assumed it. (*Id.* at 12.)

Appellant asked the officers if he could go into the police station and get a cup of coffee. (N.T., suppression at 12, 29.) Officer Moore advised appellant that the police station was a secure area and he would be safe there. (*Id.* at 29.) The officers took appellant into an unsecured interview room located next to the lobby area. (*Id.* at 12-13, 14, 30.) They both smelled an odor of alcohol on appellant at that time and observed that his eyes were bloodshot. (*Id.* at 24, 30, 37.)

Once in the police station, Officer Bartholomew left the room to get appellant a cup of coffee. (N.T., suppression at 15, 31.) After sitting down at the table in the interview room, appellant continued to recount for Officer Moore his story regarding threats being made against his life. (*Id.* at 31.) At one point in the conversation, appel-

lant placed his hands on his head and blurted out, "I burned my church tonight." *(Id.)* Officer Moore responded by asking appellant if he was at the church that evening. Appellant replied that he was *not* there but that he had heard the church was burning from the dispatcher. *(Id.* at 31-32, 40.) Officer Moore left the interview room to notify his supervisor of appellant's inculpatory statement. *(Id.* at 32-33.) Later, as appellant lay on the floor resting, he continued to periodically make unsolicited remarks to Officer Bartholomew. At one point, he stated that he was at the Ephrata Flea Market all night with the owner, Faith Fisher. *(Id.* at 18.)

At approximately 5 a.m., Detective Bradley Ortenzi and his immediate supervisor, Sergeant Timothy Davis, entered the interview room where appellant lay on the floor resting. (N.T., suppression at 43.) The door to the interview room had been left open and the light off while appellant rested. *(Id.)* The officers turned the light on and introduced themselves to appellant. *(Id.* at 44.) At that time, appellant asked for some coffee and said he needed to wash his face in the restroom. *(Id.* at 44-45.) With that, he got up, exited the room and headed toward the restroom in the lobby while Detective Ortenzi got him another cup of coffee. *(Id.* at 45-46.) Sergeant Davis stayed in the interview room and waited for appellant to return. *(Id.* at 45.)

Detective Ortenzi returned with the coffee for appellant and closed the door to the interview room. At that time, he detected an odor of alcohol on appellant. (N.T., suppression at 54.) Detective Ortenzi also smelled the odor of gasoline emanating from appellant and observed what appeared to be a burn mark on appellant's nylon shorts. *(Id.* at 49.)

The officers began the interview by asking appellant about the threats being made against him. (N.T., suppression at 47.) Appellant repeated for Sergeant Davis and Detective Ortenzi his concerns regarding the mob or Mafia from the New Orleans area being after him because of his undercover drug work and because of an unpaid debt. (*Id.* at 47, 53.) He told the police he did not feel safe outside. (*Id.* at 54.) Appellant also advised the officers that he was living out of his van which was parked at the Ephrata Flea Market but that it had run out of gas. *(Id.)*

At one point in the conversation, appellant asked to smoke a cigarette. (N.T., suppression at 47.) Initially, Sergeant Davis advised appellant that there was a no smoking policy inside the building. *(Id.)* Sergeant Davis then asked the lieutenant on duty whether appellant could be accommodated and the lieutenant gave permission for appellant to smoke in the processing room where there were large fans. *(Id.)*

At approximately 5:27 a.m., the officers and appellant left the interview room and proceeded through the police station to the processing room so that appellant could smoke. (N.T., suppression at 48, 55.) Up to this point in the interview, appellant had not been told he could not leave the interview room or the police station; nor had his movements been restricted in any way. *(Id.)* He had still not been patted down or searched by the police. *(Id.)*

Once in the processing room, Detective Ortenzi advised appellant that he wanted to speak to him about the fire and began reading appellant his *Miranda* rights. (N.T., suppression at 49.) Appellant became "agitated

and upset" and said, "F**k that, you think I did that," and then requested to speak to his attorney, Christopher Patterson. *(Id.)* Appellant was provided with a telephone book and a telephone and he made a call to counsel. *(Id.)* At that point, the interview ended and Sergeant Davis advised appellant he was under arrest. *(Id.* at 50.) Because of appellant's invocation of his right to counsel, the officers did not continue with the *Miranda* warnings.

At the suppression hearing, appellant sought to exclude his statements on the basis that he was in police "custody" without benefit of *Miranda* warnings when the statements were made.

"The warnings articulated by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), become mandatory whenever one is subjected to custodial interrogation. The United States Supreme Court has defined custodial interrogation as 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' . . . 'Police detentions only become custodial when, under the totality of the circumstances, the conditions and/or duration of the detention become so coercive as to constitute the functional equivalent of formal arrest.' . . . Whether a person is in custody for *Miranda* purposes depends on whether the person is physically (deprived) of his freedom of action in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by the interrogation. Moreover, the test for custodial interrogation does not depend upon the subjective intent of the law enforcement officer interrogator. Rather, the test focuses on whether the indi-

vidual being interrogated reasonably believes his freedom of action is being restricted. . . . The factors a court utilizes to determine, under the totality of the circumstances, whether a detention has become so coercive as to constitute the functional equivalent of arrest include: the basis for the detention; its length; its location; whether the suspect was transported against his or her will, how far, and why; whether restraints were used; whether the law enforcement officer showed, threatened or used force; and the investigative methods employed to confirm or dispel suspicions. The fact that a police investigation has focused on a particular individual does not automatically trigger 'custody,' thus requiring *Miranda* warnings. . . ." *Commonwealth v. Baker,* 963 A.2d 495, 500-501 (Pa. Super. 2008). (citations omitted) (internal quotations omitted)

In the instant case, I found that, under the totality of the circumstances, appellant's interview with Officers Bartholomew and Moore did not become the functional equivalent of an arrest. Of particular significance is the fact that it was appellant who sought out police assistance in his three telephone calls to the 9-1-1 dispatcher while sitting immediately outside the Ephrata Police Station. In the calls and in his conversations with the responding officers, appellant specifically requested admittance to the police station for his own safety and protection.[7] The police did nothing to compel appellant to enter the police station. (N.T., suppression at 13, 29.) Nor did they pat

---

7. Jerome Gottlieb M.D., a psychiatrist, who as part of his evaluation of appellant, listened to the 9-1-1 calls, used the word "pleading" to describe appellant's effort to get into the police station. (N.T., suppression at 65.)

him down, search him, manhandle him, handcuff or shackle him, or otherwise restrict his movements in any way prior to his entering the police station. *(Id.)* Thus, appellant freely and voluntarily accompanied Officers Moore and Bartholomew into the police station to explain the alleged threats being made against him by the Mafia from New Orleans.

Once inside the station, appellant was escorted to an interview room off the lobby. He was not patted down or searched at that time. (N.T., suppression at 13, 29.) No weapons were drawn, and no restraints were used on appellant. *(Id.)* The door to the interview room was left open, and appellant exercised freedom to move about the station. (*Id.* at 33, 45.) Officers Moore and Bartholomew testified that at no time did they block the door to the interview room to prevent appellant from leaving, tell appellant he could not leave the station, or deny any request made by appellant. (*Id.* at 17-18, 34.) They further noted that appellant made no attempt to leave the interview room, and made no requests for use of the bathroom, coffee, food, or anything else. (*Id.* at 18, 34.)

Officer Moore testified that he did not force appellant to make the statement regarding his burning of the church, nor did he promise him anything to get him to make the statement. (*Id.* at 33.) Lastly, the officers stated that they did not preclude appellant from doing anything inside the room and, in fact, appellant said he needed to rest and did lay down on the floor for a period of time. (*Id.* at 17, 34.)

It is well-established that a defendant's spontaneous statements not made in response to police conduct or questioning are not subject to suppression. *Common-*

*wealth v. Avondet,* 439 Pa. Super. 421, 425, 654 A.2d 587, 589 (1995) (citing *Commonwealth v. Odrick,* 410 Pa. Super. 245, 599 A.2d 974 (1991)).

"Thus, the absence of *Miranda* warnings does not require suppression of a suspect's custodial statement if, for example, the suspect spontaneously 'blurts out' the statement, . . . or makes an incriminating statement in the course of 'small talk' with authorities, . . . or is merely responding to biographical questioning, . . . or makes an incriminating statement after voluntarily initiating communication with the authorities, . . . or makes an incriminating statement in response to a declaration, rather than an inquiry, on the part of the authorities." *Commonwealth v. Sepulveda,* 579 Pa. 217, 239-40, 855 A.2d 783, 796-97 (2004) (Castille, concurring). (citations omitted) Under the totality of the circumstances in this case, appellant was not in police custody at the time he blurted out to Officer Moore that he "burned [his] church" and this incriminating statement, which was given freely and spontaneously without any compelling influences, was clearly admissible at trial.

Alternatively, appellant claims his statements to the 9-1-1 operator and to the police should have been suppressed, as "their admission violated the rules of testimonial capacity." (See appellant's statement of errors at ¶1.) Appellant claims that he established at the suppression hearing that he "was not competent to make the statements, and that the statements were the products of his psychotic illness."[8] *(Id.)*

---

8. This issue of testimonial capacity was raised in appellant's pretrial suppression motion (see motion to suppress at ¶¶6, 8), and sup-

At the suppression hearing, a psychiatric witness for the defense, Dr. Jerome Gottlieb, testified that, in his opinion, appellant suffered from schizoaffective disorder and that, in the early morning hours of September 25, 2006, he was "actively psychotic," "not in touch with reality," and suffering from a "fixed delusion" that he was a confidential informant being chased by the mob. (N.T., suppression at 66-67.) His professional conclusion was that appellant's psychosis "would affect his actions [and] his behavior," as well as "[h]is ability to reason." (*Id.* at 67.) Based upon this expert opinion, defense counsel argued that appellant "wasn't mentally competent" to make an admission. (*Id.* at 75.)

The standard for determining whether mental capacity existed to make admissions is "whether [at the time of his admissions, the defendant's] memory, his thinking processes or his orientation to reality made it likely that his admissions were untrue." *Commonwealth v. Mozzil-*

---

pression was denied after a hearing. (N.T., suppression at 82.) However, Pa.R.Crim.P. 581 which governs pretrial suppression of evidence only applies to evidence allegedly *"obtained in violation of the defendant's rights."* See Pa.R.Crim.P. 581(A), (H), (I), and the comment to the rule. (emphasis added) Appellant's challenge here is to his own competency to make the admissions. Our Supreme Court has ruled the issue of competency to make admissions to be one for the determination of the trial court. See *Commonwealth v. Scarborough,* 491 Pa. 300, 310, 421 A.2d 147, 151 (1980); *Commonwealth v. Cunningham,* 457 Pa. 397, 403, 322 A.2d 644, 647 (1974). Thus, this issue was not such as could be properly raised or heard at a pretrial suppression proceeding. See *Scarborough, supra; Cunningham, supra;* Pa.R.Crim.P. 581(A) and the comment to the rule. Since appellant failed to object to the admission of his statements at trial on the ground of his testimonial incapacity (see N.T., trial at 102, 120), the issue is technically waived.

*lo,* 443 Pa. 171, 176, 278 A.2d 874, 877 (1971). In *Mozzillo,* the defendant was institutionalized as incompetent to stand trial at the time the admissions were made. The Supreme Court held that under such circumstances the presumption of competency is reversed and the Commonwealth has the burden of establishing that the defendant was testimonially competent at the time the admissions were made. The Commonwealth failed to meet its burden in the *Mozzillo* case because the evidence presented was irrelevant to the defendant's competency at the time of his admissions.

In the instant case, Dr. Gottlieb conceded on cross-examination that, despite being psychotic, on three separate occasions he found appellant competent to stand trial; that is, appellant consistently demonstrated an understanding of the nature of the charges against him and the criminal proceedings, and an ability to participate with his attorney in his defense. (N.T., suppression at 68-69.) Moreover, the Commonwealth presented the testimony of Officer Moore, who observed appellant at or near the time the inculpatory statements were made. He testified that appellant was oriented to time and place, and knew who he was and who the officers were. (N.T., suppression at 40-41.) Appellant was also clear and coherent in his description of his van, its location and the name of his church. *(Id.)*

Our Supreme Court has held that "[w]hile internal elements impinging upon a defendant's will, such as his physical and psychological condition, may render a confession which follows interrogation involuntary, neither the Pennsylvania nor the United States Constitution protect a defendant from statements which originate

entirely from internal compulsion resulting from a mental disease." *Commonwealth v. Bracey,* 501 Pa. 356, 369, 461 A.2d 775, 781-82 (1983). As noted above, at the conclusion of the suppression hearing I found that the inculpatory statements spontaneously uttered by appellant were not the result of police custodial interrogation. Accordingly, I did not need to address appellant's mental capacity for waiving his constitutional rights.[9]

The evidence at the suppression hearing established that (1) appellant was oriented as to time, date and place, (2) he recognized the police officers with whom he was conversing, and (3) he knew who he was. Most importantly, when confronted by the police about the fire, appellant responded very rationally by invoking his right to counsel and then looking up the attorney's name in the telephone book and calling him.

Appellant's motion to suppress was properly denied and this appellate issue lacks merit.

### B. *Prior Record Score*

Appellant next claims the court erred in determining that appellant's criminal record (including in-state and

---

9. Our Supreme Court has consistently held that defendants with proven psychological defects are capable of waiving their constitutional rights and giving voluntary confessions. See *Commonwealth v. Logan,* 519 Pa. 607, 618-19, 549 A.2d 531, 537 (1988) and cases cited therein. In *Bracey, supra,* the court noted that "a person with [a] mental illness including a history of hallucinations and delusions may be capable of waiving her constitutional rights." 501 Pa. at 370 n.7, 461 A.2d at 782 n.7. Thus, the appellate case law is clear that the fact that mental illness distorts a defendant's perceptions of reality does not establish per se that a defendant's waiver of constitutional rights is defective.

out-of-state convictions) supported a prior record score of two. This issue was raised in appellant's post-sentence motion and was adequately addressed in this court's opinion of January 26, 2009; thus, the analysis need not be repeated here. Suffice it to say that this court did conduct an inquiry into the circumstances of appellant's prior convictions, in-state and out-of-state, did indicate on the record which facts it deemed accurate, and did determine from those facts the appropriate prior record score for appellant to be, at a minimum, two.

## C. *Request for Restitution Hearing*

Appellant further claims the trial court erred in denying defense counsel's request for a restitution hearing following his sentencing on December 6, 2008. At the sentencing, restitution was ordered in the subrogation amounts of $463,508.71 for Brotherhood Mutual Insurance Company, which insured the Trinity Lutheran Church, and $11,551.19 for Delaware Valley Workers' Compensation Trust, which covered the medical expenses for an injured firefighter. (N.T., sentencing at 25.) In his petition, appellant noted that "[p]roof of how restitution was calculated was not provided to petitioner or his counsel at the time of hearing." (See petition for restitution hearing at ¶4.)

The transcript from the sentencing hearing indicates that the assistant district attorney did discuss the restitution amounts with defense counsel prior to the hearing. (See N.T., sentencing at 25.) Defense counsel acknowledged receipt of the sum totals but noted that he was "*probably* gonna file for a restitution hearing to get the documentation to support it." (*Id.* at 26. (emphasis

added)) When pressed by the court, defense counsel stated he *would* be filing a restitution petition within the next 10 days "just to preserve the right and then when documentation comes, if it's all in order, obviously it will—there will be no need for a restitution hearing." (*Id.* at 26-27.) Accordingly, the court ordered restitution but noted: "[R]estitution is ordered with the understanding that the defense has the right to receive documentation of that and to have a restitution hearing, if necessary, to contest the amount." (*Id.* at 33-34.)

Thereafter, defense counsel filed a timely petition for a restitution hearing and the Commonwealth filed its response on December 30, 2008. Attached to the response were the documents supporting the subrogation amounts due Brotherhood Mutual Insurance Company and Delaware Valley Workers' Compensation Trust. (See Commonwealth's response to defendant's petition for restitution hearing, exhibits "A" and "B".) The assistant district attorney noted that, while said documentation was in the possession of the restitution advocates in the district attorney's office at least four weeks prior to the sentencing in this matter, neither appellant nor his counsel had requested to view it prior to the sentencing hearing or prior to the filing of their petition.

Having found the documentation sufficient to support the restitution amounts owed by appellant, this court denied appellant's petition for a restitution hearing, in part based upon defense counsel's representation that there would be no need for an actual hearing if documentation existed to support the subrogation amounts. On appeal, appellant claims the court erred in denying defense counsel's request for a restitution hearing because,

"*[a]t the sentencing hearing,* the Commonwealth provided no evidence to support its claims regarding the restitution owed." (See statement of errors at ¶3. (emphasis added)) Appellant fails to acknowledge that sufficient evidence was presented after the sentencing to obviate the need for another hearing. Accordingly, there was no trial court error and this appellate issue lacks merit.

## D. *Weight of the Evidence*

Lastly, appellant raises a weight of the evidence challenge. The Commonwealth's evidence presented at the trial in this matter was thoroughly summarized in this court's opinion of January 26, 2009, and will not be repeated here. In his post-sentence motion, appellant argued that he "presented evidence that it would be impossible for her [sic] to be the perpetrator of the arson, burglary, and also risking a catastrophe" and that the Commonwealth did not rebut this evidence. (See appellant's motion to vacate jury verdict at ¶6.) Each of appellant's arguments was comprehensively addressed in the January 26, 2009 opinion, and I rely upon that opinion for purposes of this appeal. I will simply note that a thorough review of the record in the instant matter showed that the totality of the evidence presented in this case, as received, evaluated and judged by the jury, was clearly of adequate weight to support the verdicts of guilty on all counts.

I do need to address, however, appellate counsel's comments regarding this court's observations relative to defense counsel's rendition of the facts in the post-sentence motion. Specifically, I wrote:

"This court must express its concern that defense counsel is playing 'fast and loose' with the record in this case, first by creating facts out of whole cloth (with respect to Ms. Fisher), and second by distorting facts to arrive at the desired conclusion (with respect to Mr. Wagner). [Appellant's] post-sentence motion was filed on December 12, 2008 and the trial transcripts were filed on October 30, 2008, so there is really no excuse for such a distortion of the record." (See January 26, 2009 opinion at 18.)

Appellate counsel apparently took offense to these remarks directed toward defense counsel and offered the following comments. First, "[i]n the post-sentence motion, defense counsel specifically notes that he has prepared the motion from memory and has documented the facts to the best of his knowledge. This statement was added at the suggestion of appellate counsel because the public defender's office *did not have* a copy of the transcripts when the post-sentence motion was prepared." (See statement of errors at ¶4. (emphasis in original)) Appellate counsel then recounts the timetable involved: post-sentence motion filed December 12, 2008; sentencing transcript received in public defender's office on December 17, 2008; trial transcripts e-mailed to public defender's office on December 19, 2008; and hard copies of trial transcripts received in public defender's office on December 30, 2008. *(Id.)* Second, appellate counsel notes that "*appellate staff* was not aware that trial transcripts had already been produced until December 17, 2008, after the post-sentence motion had been filed." (*Id.* (emphasis added)) From these facts, appellate counsel concludes that "*trial counsel* did not have access to the

transcripts when he prepared the post-sentence motion." (*Id.* (emphasis added))

Appellant was convicted on September 12, 2008, at 1:30 p.m. Less than two hours later, the court entered an order directing the court reporter to transcribe the notes of testimony from the suppression hearing and the jury trial in this case. (See order of September 12, 2008.) The court further directed that the transcripts were to be filed on or before October 3, 2008. *(Id.)* A copy of this order was delivered to defense counsel, Matthew Bomberger. The transcripts were not, in fact, lodged until October 6, 2008, and were not filed until October 30, 2008. Still, this was a full five weeks before appellant's sentencing on December 6, 2008, and six weeks before the filing of appellant's post-sentence motion.

The fact that "the public defender's office did not have a copy of the transcripts when the post-sentence motion was prepared" (see statement of errors at ¶4), is irrelevant to the question of whether defense counsel *had access to* the transcripts. Exactly when e-mailed copies and hard copies of the transcripts were received by the public defender's office begs the question of when defense counsel requested them, based upon his knowledge that they would be available in early October 2008. A simple check of the criminal docket would have told defense counsel *and* the public defender's office that the transcripts were available for review. Thus, the fact that *"appellate staff"* in the public defender's office was unaware that trial transcripts had been filed on October 30, 2008, has no bearing on trial counsel's knowledge of the filing. Nor does it diminish trial counsel's obligation to obtain a copy of the produced record so as to

accurately present the facts to the court in a "weight of the evidence" argument in a post-sentence motion.

Accordingly, defense counsel's failure to obtain a copy of the transcript, which was readily available, is no excuse for his misrepresentation of the facts to this court. And my comment in the January 26, 2009 post-sentence opinion, objected to by appellate counsel, was appropriate and well-deserved under the circumstances.[10]

### III. CONCLUSION

For the reasons set forth above, appellant's issues on appeal are meritless and his conviction should be affirmed.

Accordingly, I enter the following:

### ORDER

And now, April 7, 2009, the court hereby submits this opinion pursuant to Rule 1925(a) of the Pennsylvania Rules of Appellate Procedure.

---

10. I have taken the time to address appellate counsel's comments only because she included them in the statement of errors to be addressed on appeal before the Superior Court and because I wanted the reader to understand the context in which my statements were made.