J-S55028-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| ANTONIO R. ORTIZ, | : | |
| | : | |
| Appellee | : | No. 3588 EDA 2013 |

Appeal from the Order Entered December 17, 2013,
In the Court of Common Pleas of Northampton County,
Criminal Division, at No. CP-48-CR-0001805-2013.

BEFORE:  BOWES, SHOGAN and OTT, JJ.

MEMORANDUM BY SHOGAN, J.:                **FILED NOVEMBER 06, 2014**

The Commonwealth appeals from the order of the trial court granting the motion filed by Appellee, Antonio R. Ortiz, to suppress statements made by Appellee to the police.  We affirm and remand for further proceedings.

The suppression court presented its findings of fact in this case as follows:

> 1. On December 24, 2012, at approximately 1:30 a.m., Inspector Daniel Reagan, of the City of Easton Police Department received a call to respond to the 400 Block of Northampton Street, Easton, following a report of an assault.  N.T. 9/12/13 at 9.
>
> 2. Inspector Reagan was informed that one individual (later identified as Andres Ruiz Avelizapa) had been taken to the hospital in serious condition and that a suspect was being detained (identified as [Appellee]).  Id.

3. [Appellee] was taken to the police station and detained in the juvenile booking room, because a female witness was being detained in the adult booking room. Id. at 10.

4. The female witness [who was detained in the adult booking room] was identified as Samantha Vega, who was [Appellee's] girlfriend. Id.

5. When Inspector Reagan entered the juvenile booking room, he observed [Appellee] detained in the holding area. Id.

6. Inspector Reagan was in plain clothes and did not have a firearm with him. Id. at 11.

7. Inspector Reagan observed that [Appellee] was excited and agitated. Id.

8. Inspector Reagan told [Appellee] that he wished to speak with him and removed [Appellee] from the holding cell. Id. at 12.

9. The video of [Appellee] in the booking room was submitted as Commonwealth Exhibit 1. The transcript of that video was submitted as Commonwealth Exhibit 3.

10. Upon entering the booking room, Inspector Reagan attempted to read [Appellee] his Miranda rights.[1] N.T. 9/12/13 at 13, Exhibit 3 at 2-3.

11. [Appellee] immediately asserted that he wanted a lawyer. Id. [Appellee] specifically stated, "Not to be rude, I'm not signing nothing without a lawyer. I'm being arrested, I need a lawyer. I want a lawyer . . ." Exhibit 3 at 3.

12. Inspector Reagan explained to [Appellee] that because he wanted a lawyer, they could not speak further. N.T. 9/12/13 at 13, Exhibit 3 at 2-3.

13. [Appellee] continued to ask if he could go to work the following day. Exhibit 3 at 3-4.

---

[1] **Miranda v. Arizona**, 384 U.S. 436 (1966).

14. [Appellee] then stated that he wanted to talk "off the record." N.T. 9/12/13 at 14, Exhibit 3 at 4.

15. Inspector Reagan again tried to read [Appellee] the Miranda rights form, but [Appellee] continued to ask questions. Exhibit 3 at 6.

16. Lieutenant Matthew Gerould entered the booking room and directed [Appellee] to return to the holding cell, and [Appellee] stated that "I waive the lawyer." N.T. 9/12/13 at 23, Exhibit 3 at 7.

17. Lt. Gerould reminded [Appellee] that they could not speak because [Appellee] had requested a lawyer. Exhibit 3 at 7.

18. [Appellee] proceeded to state that he tried to help the [victim], [when] he saw [the victim] laying on the ground through the window. Exhibit 3 at 7-8.

19. Lt. Gerould told [Appellee] that he knew [Appellee's] version was untrue and that [Appellee] was under arrest for assault because witnesses saw [Appellee] hit the victim. Exhibit 3 at 9-12.

20. Lt. Gerould told [Appellee] that Samantha stated she and [Appellee] were arguing and the victim intervened and [Appellee] hit the victim, knocking him out. Exhibit 3 at 12.

21. [Appellee] responded that the victim had groped Samantha, so he pushed him. Exhibit 3 at 12-13.

22. Lt. Gerould stated that he continued to answer [Appellee's] questions to prevent [Appellee] from becoming more agitated and to prevent an officer-safety issue. N.T. 9/12/13 at 25.

23. Detective Darren Snyder and Officer Russell Demko were directed by Lt. Gerould to collect [Appellee's] clothing for evidence. Id. at 30-31. The video of this interaction was submitted as Commonwealth Exhibit 2, and the transcript was admitted as Commonwealth Exhibit 4.

24. During the collection of [Appellee's] clothes, he continued to ask questions and make statements. N.T. 9/12/13 at 32, Exhibit 4 at 1-2.

25. [Appellee] asked "Is there any way we can do that lawyer shit again?" Exhibit 4 at 2. [Appellee] stated that he wanted to talk. Exhibit 4 at 4-5.

26. Detective Snyder reminded [Appellee] several times that they couldn't speak because [Appellee] requested an attorney. N.T. 9/12/13 at 32, Exhibit 4 at 7-8.

27. Detective Snyder described [Appellee's] demeanor as excited and agitated. N.T. 9/12/13 at 32.

28. Detective Snyder also transported [Appellee] to the Northampton County Prison Central Booking, along with Detective Piperato. Id. at 33.

29. While in the car, [Appellee] asked Detective Snyder what he was under arrest for, and if it was serious. Id.

30. Detective Snyder advised [Appellee] that he was under arrest for aggravated assault which was a serious felony. Id. at 34.

31. [Appellee] asked Detective Snyder why the charges were so serious. Id.

32. Detective Snyder explained that the victim was in the hospital and was not expected to live. Id.

33. At Central Booking, [Appellee] continued to speak to Detective Snyder. Id. at 34-35.

34. Detective Snyder reminded [Appellee] that they could not speak. Id. at 35.

35. [Appellee] stated that he pushed the victim because [the victim] had grabbed [Appellee's] girlfriend. Id.

36. [Appellee] then stated that he did not assault the victim but was across the street and observed the victim being assaulted by a fat guy and a guy in a wheelchair, and [Appellee] only ran across the street to render aid. Id.

37. [Appellee] was charged with Criminal Homicide and Aggravated Assault.

Trial Court Opinion, 12/17/13, at 1-5.

On August 22, 2013, Appellee filed a motion to suppress his statements made to the police. The trial court held a hearing on the motion to suppress and both sides filed briefs with the trial court. On December 17, 2013, the trial court entered an order granting Appellee's motion to suppress. The Commonwealth then brought this timely appeal.[2]

The Commonwealth presents the following issue for our review:

---

[2] The record reflects that the Commonwealth has filed a certification pursuant to Pa.R.A.P. 311(d), indicating that the trial court's order prohibiting the introduction of evidence terminates or substantially handicaps the prosecution of the case. Notice of Appeal, 12/18/13. Under Pa.R.A.P. 311(d), the Commonwealth has a right to appeal interlocutory orders in criminal cases if the Commonwealth certifies that the orders will terminate or substantially handicap the prosecution. **Commonwealth v. Flamer**, 53 A.3d 82, 86 n.2 (Pa. Super. 2012). Specifically, Rule 311(d) provides as follows:

In a criminal case, under the circumstances provided by law, the Commonwealth may take an appeal as of right from an order that does not end the entire case where the Commonwealth certifies in the notice of appeal that the order will terminate or substantially handicap the prosecution.

Pa.R.A.P. 311(d). Therefore, pursuant to Pa.R.A.P. 311(d), this Court has jurisdiction to hear this appeal from the trial court's interlocutory order, even though the order did not terminate the prosecution.

I. WHETHER THE SUPPRESSION OF A DEFENDANT'S SPONTANEOUSLY UTTERED STATEMENTS TO THE POLICE WAS PROPER.

Commonwealth's Brief at 4.

The Commonwealth argues that the trial court erred in suppressing the statements made by Appellee to police. The Commonwealth claims that when the police attempted to give Appellee his *Miranda* warnings, Appellee consistently interrupted them. The Commonwealth further contends that, although Appellee stated that he wanted a lawyer even though he had not been *Mirandized*, Appellee continued to make unsolicited and spontaneous comments about the crime after police indicated that they could not speak to him. The Commonwealth concludes that these statements by Appellee should be admissible at trial. For the following reasons we are constrained to disagree.

Our standard of review is as follows:

When the Commonwealth appeals from a suppression order, we . . . consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. The suppression court's findings of fact bind an appellate court if the record supports those findings. The suppression court's conclusions of law, however, are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts.

*Commonwealth v. Nester*, 709 A.2d 879, 880-881 (Pa. 1998) (internal citations omitted).  The issue of voluntariness is a question of law.  *Id*. at 881.

Further, it is well settled that "[t]he admission of evidence is within the sound discretion of the trial court, and will be reversed on appeal only upon a showing that the trial court clearly abused its discretion." *Commonwealth v. Miles*, 846 A.2d 132, 136 (Pa. Super. 2004) (*en banc*) (citing *Commonwealth v. Lilliock*, 740 A.2d 237 (Pa. Super. 1999)). Abuse of discretion requires a finding of misapplication of the law, a failure to apply the law, or judgment by the trial court that exhibits bias, ill-will, prejudice, partiality, or that was manifestly unreasonable, as reflected by the record.  *Commonwealth v. Montalvo*, 986 A.2d 84, 94 (Pa. 2009).

We are aware that Pennsylvania Rule of Criminal Procedure 581, which addresses the suppression of evidence, provides in relevant part as follows:

> (H)  The Commonwealth shall have the burden . . . of establishing that the challenged evidence was not obtained in violation of the defendant's rights.

Pa.R.Crim.P. 581(H).  Moreover, "[t]he Commonwealth need only show by a preponderance of the evidence that a voluntary, knowing and intelligent waiver of a constitutional right was made." *Commonwealth v. Davis*, 526 A.2d 1205, 1209 (Pa. Super. 1987).

It is a precept of constitutional law that a suspect subject to a custodial interrogation by police must be warned that he has the right to

remain silent, that anything he says may be used against him in court, and that he is entitled to the presence of an attorney. ***Miranda***, 384 U.S. at 469. Therefore, the protection against self-incrimination provided by ***Miranda*** is triggered only if two conditions are met: the defendant must be in custody, and the defendant's statements must be the result of interrogation. ***See Commonwealth v. Heggins***, 809 A.2d 908, 914 (Pa. Super. 2002) (stating that "in order to trigger the safeguards of ***Miranda***, there must be both custody and interrogation"). If an individual is not advised of his ***Miranda*** rights prior to custodial interrogation by law enforcement officials, evidence obtained through the interrogation cannot be used against him. ***In re K.Q.M.***, 873 A.2d 752, 755 (Pa. Super. 2005).

The Court in ***Miranda*** explained the following:

> Our holding will be spelled out with some specificity in the pages which follow but briefly stated it is this: the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.

***Miranda***, 384 U.S. at 444. Hence, without custody there is no ***Miranda***-based argument for suppression.

Regarding interrogation, our Supreme Court has long explained that interrogation occurs when the police should know that their words or actions are reasonably likely to elicit an incriminating response, and the

circumstances must reflect a measure of compulsion above and beyond that inherent in custody itself. *Commonwealth v. Bracey*, 461 A.2d 775, 780 (Pa. 1983). However, statements not made in response to custodial interrogation are classified as gratuitous and are not subject to suppression for lack of *Miranda* warnings. *Heggins*, 809 A.2d at 914. As our Supreme Court has stated, "*Miranda* does not preclude the admission of spontaneous utterances." *Commonwealth v. Johnson*, 42 A.3d 1017, 1029 (Pa. 2012). In fact, our Supreme Court has often repeated that volunteered or spontaneous statements, not the product of police conduct, are admissible even when the suspect has not received *Miranda* warnings. *Commonwealth v. Baez*, 720 A.2d 711, 720 (Pa. 1998). *See also Commonwealth v. Gibson*, 720 A.2d 473, 480 (Pa. 1998) (holding that voluntary statements that are not responsive to any questions are admissible); *Commonwealth v. King*, 554 721 A.2d 763, 775 (Pa. 1998) (finding that a defendant's unsolicited remarks are admissible).

However, "interrogation" has been defined as "questioning initiated by law enforcement officials." *Commonwealth v. DeJesus*, 787 A.2d 394, 401 (Pa. 2001) (citing *Miranda*, 384 U.S. at 444). Interrogation implicating a suspect's *Miranda* rights occurs only when the police "should know that their words or actions are reasonably likely to elicit an incriminating response from the suspect." *Commonwealth v. Luster*, 71 A.3d 1029,

1051 (Pa. Super. 2013) (*en banc*) (quotation marks omitted). In order to determine whether questions posed to a suspect were "reasonably likely to elicit an incriminating response," courts must focus on a suspect's perceptions and give relevance to the officer's constructive knowledge. **DeJesus**, 787 A.2d at 402; **see also Commonwealth v. Cruz**, (Pa. Super. 2013) (stating that "Interrogation is defined as 'police conduct calculated to, expected to, or likely to evoke admission.'").

Our review of the record reflects that there is no question that Appellee was indeed in custody for purposes of **Miranda** when he made the subject communication with police. Inspector Daniel Reagan testified that while Appellee was in the juvenile booking room at the police station he was under arrest.[3] N.T., 9/12/13, at 16. Likewise, Detective Darren Snyder, the police officer who transported Appellee by vehicle from the juvenile booking room to the Northampton County Prison Central Booking area, informed Appellee that he was under arrest and explained the nature of the crime involved. **Id**. at 33-34. Accordingly, for the sake of our review, we must conclude that Appellee was subject to custody and under arrest.

It is undisputed that Appellee was not read his **Miranda** rights at any time prior to his statements to the police. In fact, a fair reading of the booking interviews reflects that Appellee asked to be read his rights and

---

[3] As previously mentioned, Appellee was in the juvenile booking room of the police station because the adult booking room was occupied.

they were declined because Appellee had previously expressed his desire for a lawyer. Specifically, the transcript of the booking interview contains the following exchange:

OFFICER #2:     Get back in the cage.

[APPELLEE]:     I'm not trying to be a wise guy --

OFFICER #2:     No, no, no. You ask for a lawyer, we got to stop.

[APPELLEE]:     No, no, no.

OFFICCER #1:    Take your sneakers off.

[APPELLEE]:     **Read it, read it, read it**.

OFFICER #1:     Take your shoes off.

OFFICER #2:     [Appellee], **we can't, man.**

[APPELLEE]:     **Read that rights** ---

OFFICER #2:     [Appellee], **we can't.   You asked for a lawyer.**

Commonwealth Exhibit 3, at 7 (emphasis added).

Indeed, our further review of the record indicates that Appellee was in custody for several hours and exposed to multiple police officers during that period. Although Appellee was told that he was not being "questioned," we cannot help but conclude that an implicit interrogation of Appellee occurred, as reflected in the following interaction:

OFFICER #2:     I understand. I understand. But here, I'm just explaining to you what's going on. We're not asking you

-11-

questions.  You asked for an attorney.  What I'm explaining to you is, you're under arrest now for assault, because what you said wasn't the truth, because people saw you involved with this guy.  You didn't see it from inside, okay?

[APPELLEE]:  People who seen what?

OFFICER #2:  I can't tell you witnesses.  People saw you hit this guy.

[APPELLEE]:  I tried to help the guy out.

OFFICER #2:  The witnesses – (inaudible.)

[APPELLEE]:  I tried to help the guy.

OFFICER #2:  No.  No.  No.  They saw you hit him.  You had just said that, you had just said that-

[APPELLEE]:  Yeah --

OFFICER #2:  No.  You said you saw him from inside --

[APPELLEE]:  No, I was outside the building --

OFFICER #2:  No, you just said you were inside the building.

* * *

OFFICER #2:  No, no, no.

[APPELLEE]:  I'm just a little upset.  I got one more strike on my job --

OFFICER #2:  [Appellee], real quick.  You're being charged with assault, because you just told us that you saw this guy when you were inside the Hotel Hampton.  Other people witnessed you hit this guy.

[APPELLEE]:  No.  I seen it through the window.

OFFICER #2:   And you're not even admitting that you were arguing with the guy before you hit him.

[APPELLEE]:   Why would I argue - - -

OFFICER #2:   So if you didn't do anything wrong, why would you leave all that out of the story?

*Id*. at 9-10, 11.  In fact, additional portions of the transcript from the same booking interview reflect similar interrogation techniques of the Commonwealth designed to illicit incriminating responses from Appellee.  *Id*. at 11-14.  Likewise, our review of the transcript of the interview of Appellee that occurred in the juvenile booking room reflects that the police employed the same types of interrogation techniques in order to encourage Appellee to provide statements even though he was not properly *Mirandized* and had asked for an attorney.  Commonwealth's Exhibit 4.  Accordingly, contrary to the Commonwealth's assertions, we are left to conclude that Appellee's remarks, which occurred during custodial interrogation by the officers, did not constitute spontaneous, voluntary statements.

In summary, it is undisputed that Appellee was in custody at the time he made the statements, as he had been arrested, and was not properly administered his *Miranda* warnings.  Although the officers' conduct may not have constituted a typical interrogation, our review of the record reflects that the officers continued conversations with Appellee after Appellee invoked his right to an attorney.  The trial court, acting in the suppression

context, determined that the officers had engaged in conduct designed specifically to elicit incriminating information from Appellee.

Therefore, we conclude that the evidence of record supports the findings of the trial court and its legal determination that the statements made by Appellee after he invoked his right to an attorney should be suppressed. Accordingly, because the police failed to give Appellee his *Miranda* warnings prior to the custodial interrogation, the trial court properly suppressed Appellee's statements.

Order affirmed. Case remanded for further proceedings. Jursidiction relinquished.

Judge Ott joins this Memorandum.

Judge Bowes Concurs in the Result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/6/2014