J-A32007-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| ANTHONY J. SCHOLL, JR., | |
| Appellant | No. 1337 WDA 2014 |

Appeal from the Judgment of Sentence July 17, 2014
In the Court of Common Pleas of Allegheny  County
Criminal Division at No(s): CP-02-CR-0004828-2013

BEFORE:  SHOGAN, OTT, and STABILE, JJ.

MEMORANDUM BY SHOGAN, J.:                    **FILED DECEMBER 31, 2015**

Appellant, Anthony J. Scholl, Jr., appeals from the judgment of sentence imposed following his convictions of attempted homicide, aggravated assault, and recklessly endangering another person ("REAP"). We affirm.

The trial court summarized the underlying facts of this case as follows:

> On September 5, 2012, at approximately 10:30 P.M., Colin Albright rode his bicycle from the Squirrel Hill section of the City of Pittsburgh to the South Side section of the city.  As he traveled along Hot Metal Street, Albright exited the bike path and entered the roadway in front of Appellant's vehicle. Albright's actions apparently offended Appellant who was driving his vehicle on Hot Metal Street.  Consequently, Appellant followed Albright as he made his way to a set of city steps which led from Harcum Way to Josephine Street.  Albright began to ascend the steps towards his home, which was on Josephine Street, carrying his bicycle over his shoulder.  Appellant parked his vehicle and ran up the stairs to confront Appellant.  (T.T.(I) 38, 40-41, 43; T.T.(II) 39-40, 42, 174-176).[4]

⁴ The designation "T.T.(I)" followed by numerals refers to Trial Transcript, March 3, 2014. The designation "T.T.(II)" refers to Trial Transcript, March 3-5, 2014.

When Albright heard Appellant approaching from behind, Albright moved out of the way to allow Appellant to pass him on the stairs. Instead, Appellant stopped and began to stab Albright in the back of the head and shoulder. Albright, believing he was being robbed, told Appellant that he could take the bicycle. Appellant grabbed Albright by the top of the head, and slit Albright's throat lengthwise, from ear to ear. At the same time, Albright pushed the bicycle towards Appellant, who took the bicycle, ran down the steps, threw the bicycle over the railing, and fled in his car. (T.T.(I) 43-46; T.T.(II) 50).

Albright immediately called 911 and wrapped his shirt around his neck in an attempt to stop the bleeding. The 911 dispatcher was unable to ascertain Albright's location without a street address, so Albright made his way to the Birmingham Bridge Tavern, which was approximately four blocks away, to await assistance. (T.T.(I) 46-52; T.T.(II) 31-32, 43). Albright was emergently transported to the hospital where he remained for approximately five days. Appellant had severed Albright's external jugular vein and several other arteries in his neck. Albright received twenty-one sutures in his neck and fifteen staples for the stab wounds to his head. At the time of trial, Albright was still undergoing physical therapy and had significant and permanent scarring to his head, shoulder, and neck. (T.T.(I) 33, 53-56; T.T.(II) 7, 11, 14, 17).

Albright assisted the police in creating a composite sketch of his attacker. (T.T.(II) 17, 108-112). Upon further investigation and tips received from the public, Appellant was identified as a suspect. Albright identified Appellant from a photo array as being very similar to the individual who attacked him, and Appellant confessed to the attack during a subsequent interview. (T.T.(II) 23, 167-180, 200).

Trial Court Opinion, 1/15/15, at 8-10.

In a criminal information dated October 25, 2012, and filed on June 11, 2013, Appellant was charged with the crimes of criminal attempt (homicide), aggravated assault – serious bodily injury, and REAP.  On July 9, 2013, Appellant filed an omnibus pretrial motion seeking to suppress his confession and statements to police, and his identification.  The suppression court held a hearing December 2 through December 3, 2013.  In an order dated December 29, 2013, the suppression court denied the motion to suppress.[1]

On March 5, 2014, a jury convicted Appellant of the three crimes stated above.  On July 17, 2014, the trial court sentenced Appellant to serve a term of incarceration of seven to fourteen years, to be followed by a term of probation of five years for the conviction of attempted homicide.  For the crime of REAP, the trial court sentenced Appellant to serve a consecutive term of probation of two years.  This timely appeal followed.  Both Appellant and the trial court have complied with Pa.R.A.P. 1925.[2]

Appellant presents the following issues for our review:

I. DID THE TRIAL COURT ERR IN DENYING THE MOTION TO SUPPRESS INSOFAR AS [APPELLANT'S] CONFESSION WAS THE

_____

[1] We observe that the December 29, 2013 order of the suppression court was filed, along with the suppression court's opinion, on January 8, 2015. Docket Number 22.

[2] We note that Judge Jeffrey A. Manning presided over Appellant's motion to suppress and that Judge Edward J. Borkowski presided at Appellant's jury trial.

FRUIT OF AN ILLEGAL ARREST BECAUSE THE POLICE HAD NO REASONABLE SUSPICION OR PROBABLE CAUSE AT THE TIME THEY HANDCUFFED HIM, PLACED HIM IN LEG-IRONS AND TRANSPORTED HIM FROM THE COUNTY JAIL TO THE HOMICIDE OFFICE TO BE INTERVIEWED?

II. DID THE TRIAL COURT ERR IN DENYING THE MOTION TO SUPPRESS INSOFAR AS [APPELLANT'S] RIGHT TO COUNSEL UNDER THE FIFTH AMENDMENT AND ARTICLE 1, § 9 OF THE PENNSYLVANIA CONSTITUTION, WAS VIOLATED WHERE HE HAD OBTAINED COUNSEL FOR AN EARLIER, UNRELATED OFFENSE, AND THE POLICE SUBSEQUENTLY INITIATED INTERROGATION REGARDING THE INSTANT OFFENSE WITHOUT THE PRESENCE OF COUNSEL; AND HIS PURPORTED WAIVER OF COUNSEL AFTER BEING GIVEN *MIRANDA* WARNINGS,[3] WAS INVALID?

III. DID THE TRIAL COURT ERR IN DENYING THE MOTION TO SUPPRESS INSOFAR AS [APPELLANT] DID NOT KNOWINGLY AND VOLUNTARILY WAIVE HIS *MIRANDA* RIGHTS BECAUSE HE SUFFERED FROM MENTAL ILLNESS AND WAS SUBJECTED TO COERCIVE TACTICS?

IV. DID THE TRIAL COURT ERR IN RULING THAT THE TESTIMONY OF WITNESSES WHO WOULD HAVE SUPPORTED [APPELLANT'S] CLAIM THAT HIS STATEMENT WAS INVOLUNTARY, WAS INADMISSIBLE AT TRIAL?

Appellant's Brief at 5.

In his first three issues, Appellant argues that his motion to suppress his statement to the police was improperly denied. With respect to an appeal from the denial of a motion to suppress, our Supreme Court has stated the following:

Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is whether the factual

---

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

- 4 -

findings are supported by the record and whether the legal conclusions drawn from those facts are correct. When reviewing the ruling of a suppression court, we must consider only the evidence of the prosecution and so much of the evidence of the defense as remains uncontradicted when read in the context of the record. . . . Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error.

**Commonwealth v. Eichinger**, 915 A.2d 1122, 1134 (Pa. 2007) (citations omitted). "It is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given their testimony." **Commonwealth v. Gallagher**, 896 A.2d 583, 585 (Pa. Super. 2006).[4]

Further, we are aware that Pa.R.Crim.P., which addresses the suppression of evidence, provides in relevant part as follows:

(H) The Commonwealth shall have the burden . . . of establishing that the challenged evidence was not obtained in violation of the defendant's rights.

---

[4] On October 30, 2013, our Supreme Court decided **In re L.J.** In **L.J.**, our Supreme Court held that our scope of review from a suppression ruling is limited to the evidentiary record that was created at the suppression hearing. **In re L.J.**, 79 A.3d at 1087. Prior to **L.J.**, this Court routinely held that, when reviewing a suppression court's ruling, our scope of review included "the evidence presented both at the suppression hearing and at trial." **Commonwealth v. Charleston**, 16 A.3d 505, 516 (Pa. Super. 2011) (quoting **Commonwealth v. Chacko**, 459 A.2d 311 (Pa. 1983)). **L.J.** thus narrowed our scope of review of suppression court rulings to the evidence presented at the suppression hearing. In this case, Appellant's suppression hearing was held after **L.J.** was decided. Therefore, we will apply the rule announced in **L.J.** to the case at bar. **See L.J.**, 79 A.3d at 1089 (stating holding applies to "all litigation commenced Commonwealth-wide after the filing of this decision").

Pa.R.Crim.P. 581(H).

Initially, Appellant claims that his confession was the fruit of an illegal arrest because the police lacked probable cause when they handcuffed him and took him from the county jail, where he was incarcerated on unrelated charges, to the homicide office to be interviewed regarding the instant crimes. Appellant's Brief at 27-30. Basically, Appellant contends that his transportation to the homicide office amounted to the functional equivalent of an arrest, which required the police to possess probable cause.

> The Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution protect individuals from unreasonable searches and seizures, thereby ensuring the "right of each individual to be let alone." *Schneckloth v. Bustamonte*, 412 U.S. 218, 236, 36 L. Ed. 2d 854, 93 S. Ct. 2041 (1973); *Commonwealth v. Blair*, 394 Pa. Super. 207, 575 A.2d 593, 596 (Pa. Super. 1990).

*Commonwealth v. By*, 812 A.2d 1250, 1254 (Pa. Super. 2002). However, as explained below, police are not required to possess probable cause in order to transport a prisoner from jail to a police station to be interviewed in connection with another crime, and prisoners are not arrested under these circumstances because they are, by virtue of their pre-existing incarceration, already validly within state custody. Our Supreme Court analyzed this issue in *Commonwealth v. Bomar*, 826 A.2d 831 (Pa. 2003), and held that the transfer of a defendant from jail to the offices of a criminal investigation division

> did not implicate appellant's rights under the Fourth Amendment. At the time appellant was moved . . . , he was

- 6 -

already a prisoner serving time on unrelated charges; he was already unquestionably "seized" for purposes of the Fourth Amendment. The only change in appellant's status . . . was the location of his custody. The transfer from jail to the . . . offices . . . did not constitute a separate seizure of appellant under the Fourth Amendment for the obvious reason that he was already lawfully in custody.

*Id*. at 846. ***See also Commonwealth v. Watkins***, 750 A.2d 308, 314 (Pa. Super. 2000) (stating that "[d]ue to the administrative nature of the transport process used by the police herein and the fact that prisoners' Fourth Amendment rights are not coextensive with those of free citizens, we decline to require police officers to possess probable cause when transporting prisoners to police stations for custodial interrogation.").

In concluding that Appellant's motion to suppress based upon an alleged illegal arrest or detention lacked merit, the suppression court concluded that "[t]he facts in this matter are nearly identical [to the facts in ***Watkins***] and require the same result." Suppression Court Opinion, 1/29/13, at 11. Likewise, the trial court offered the following apt discussion with regard to this issue:

> Appellant first argues that his statement should have been suppressed because he was illegally detained. Appellant was housed in the Allegheny County Jail on unrelated charges. On October 25, 2012, detectives from the homicide office transported him to their office to be interviewed about the stabbing of Albright. (M.T. 8, 81).[5] However, contrary to Appellant's argument that this situation resulted in the arrest of

---

[5] The citation "M.T." refers to the notes of testimony from the suppression hearing transcript of December 2-3, 2013.

Appellant for the instant offense, the transportation order was merely the procedural means used to interview an incarcerated suspect. (M.T. 8, 81). Appellant was not arrested for the stabbing of Albright at the time of his interview, and he was free to request that the interview be terminated and that he be returned to the jail at any time, which he chose not to do. (M.T. 82-83, 85). Thus while Appellant was in custody on unrelated charges, he was free to terminate the contact with the homicide detectives on this case. Appellant was not illegally detained under the United States or Pennsylvania constitutions, and [the suppression court's] decision to deny the suppression is supported by the record. *See Commonwealth v. Watkins*, 750 A.2d 308, 313-314 (Pa. Super. 2000) (defendant who was transported from jail to police station on unrelated charges was not arrested as a result of the transportation order, and statement was found to be voluntary where defendant read and waived his Miranda rights and did not assert any physical or psychological misconduct or intimidation by the police). Appellant's claim is without merit.

Trial Court Opinion, 1/15/15, at 12-13.

Our review of the record reflects that the transportation process employed in this matter was routine, the process was effectuated by a court order, Appellant was not coerced into speaking with police about the instant crime, and he was *Mirandized* prior to questioning. Thus, we conclude Appellant's claim that the police were required to possess probable cause to transport Appellant from the county jail to another police facility for questioning lacks merit.

In his second issue, Appellant argues that his motion to suppress should have been granted based upon an allegation that his constitutional right to counsel was violated. Appellant's Brief at 30-37. Specifically, Appellant claims that his right to counsel under the Fifth Amendment to the

United States Constitution and Article 1, § 9 of the Pennsylvania Constitution was violated because he had counsel for an unrelated offense, and the police initiated an interrogation on the instant crimes without the presence of counsel.

At the outset, we observe that in **Commonwealth v. Arroyo**, 723 A.2d 162 (Pa. 1999), our Supreme Court reviewed the differences between the Fifth Amendment **Miranda** rights[6] and the Sixth Amendment "right to counsel" as set forth by the United States Supreme Court in **Moran v. Burbine**, 475 U.S. 412 (1986). Our Supreme Court summarized as follows:

> The [United States Supreme] Court noted that the "right to counsel" of which **Miranda** warnings inform a suspect does not spring from the Sixth Amendment right to counsel, but rather is a judicially created procedural device by which the suspect's Fifth Amendment privilege against self-incrimination is protected. The Court explained that the Sixth Amendment right to counsel is distinct from the right to counsel mentioned in a **Miranda** warning. A suspect has a right to be told his **Miranda** warnings at the point custodial interrogation begins. The Sixth Amendment right to counsel, on the other hand, by its very terms . . . becomes applicable only when the government's role

---

[6] In **Miranda**, the Supreme Court set forth safeguards to protect a person's rights under the Fifth Amendment to the United States Constitution which provides that a criminal defendant cannot be compelled to be a witness or give evidence against himself. **Miranda**, 384 U.S. at 461. The Court held that any statements or confessions made during a custodial interrogation must be suppressed unless, prior to making such statements, the individual was informed of his right to remain silent and right to an attorney and made a knowing, intelligent and voluntary waiver of those rights. **Id**. at 444. For a waiver of these rights to be valid, the defendant must be adequately apprised of and understand his rights and the consequences of waiving those rights, and must not be threatened, forced, or coerced to waive his rights in any way. **Commonwealth v. DeJesus**, 787 A.2d 394, 402 (Pa. 2001).

shifts from investigation to accusation. **Therefore, a suspect has no Sixth Amendment right to counsel until the first formal charging proceeding has transpired, and it can be said that the formal initiation of adversarial judicial proceedings has occurred.** The Court concluded that since the inculpatory statements at issue in **Moran** were given prior to the defendant being charged with the crime, then the defendant had no Sixth Amendment right which could be violated. The Court also specifically declined the defendant's invitation to extend the protections of the Sixth Amendment to the prearraignment phase of proceedings as such a holding would not be consistent with the Sixth Amendment's purpose of protecting an individual who is the focus of the state's prosecutorial power.

**Arroyo**, 723 A.2d at 166 (quotation marks and citations omitted) (emphasis added).

In **Commonwealth v. Keaton**, 45 A.3d 1050 (Pa. 2012), our Supreme Court further summarized the Sixth Amendment right to counsel and its limits as follows:

The Sixth Amendment right to counsel is offense-specific; it cannot be invoked once for all future prosecutions, and it only attaches at the commencement of prosecution, *i.e.*, when criminal proceedings are initiated by charge, preliminary hearing, indictment, information, or arraignment. Once the right has attached at the initiation of proceedings for a specific offense, the defendant may not be questioned further regarding that offense without counsel present; the right's purpose is to protect the unaided layman at critical confrontations with his expert adversary, the government, after the adverse positions of government and defendant have solidified with respect to a particular alleged crime. **However, a defendant whose Sixth Amendment right to counsel has attached regarding one offense may be questioned about other offenses for which prosecution has not commenced, and statements made regarding other offenses are admissible in a trial for them.**

**Id**. at 1065 (citations and quotations omitted) (emphasis added).

- 10 -

In **Arroyo**, our Supreme Court stated that "the right to counsel, as guaranteed by Article I, Section 9 of the Pennsylvania Constitution, is coterminous with the Sixth Amendment right to counsel for purposes of determining when the right attaches." **Arroyo**, 723 A.2d at 170. Here, to the extent that Appellant alleges that his right to counsel under Article I, Section 9 of the Pennsylvania Constitution, and thus his Sixth Amendment right to counsel, were violated, we conclude that because adversarial proceedings had not been commenced in the instant action at the time that Appellant was interviewed about the crime, the right to counsel had not yet attached, and questioning about the instant offense was permissible. Therefore, Appellant's assertion that his right to counsel under Article I, Section 9 of the Pennsylvania Constitution was violated fails.

We next address Appellant's claim that the waiver of his **Miranda** rights was invalid.[7] In essence, Appellant claims that questioning of Appellant on the instant matter should not have occurred because police were aware that Appellant was represented by counsel and knew that counsel did not want Appellant to speak without counsel present.

In **Commonwealth v. Rushing**, 71 A.3d 939 (Pa. Super. 2013), *reversed on other grounds*, 99 A.3d 416 (Pa. 2014), we reiterated that "the

---

[7] We note that in **Arroyo**, our Supreme Court reasoned that the privilege against self-incrimination under the Pennsylvania Constitution, found in Article I, § 9, affords the same protection as its corresponding federal provision, the Fifth Amendment. **Arroyo**, 723 A.3d at 166-167.

Fifth Amendment right to counsel is a **personal right which can only be invoked by the person holding that right.** Accordingly, whether an attorney physically appears in an attempt to represent the accused does not alter the fact that **it is the accused who must invoke his Fifth Amendment right to counsel.**" *Id*. at 951 (emphases added). ***See also Keaton***, 45 A.3d at 1067 (observing that Fifth Amendment rights apply only when the suspect has expressed his wish for the particular sort of lawyerly assistance that is the subject of ***Miranda***). Therefore, it is only Appellant who could invoke his ***Miranda*** rights.

In addressing Appellant's waiver of his ***Miranda*** rights prior to interrogation, the suppression court made the following well-reasoned conclusion:

> Here, [Appellant] was in custody when interrogated, but he was advised of his [***Miranda***] rights and executed a waiver of those rights. [Appellant] was warned, orally and in writing, of the consequences of agreeing to speak with the police without the presence of his attorney. [Appellant] was told that he had the right to refuse to speak with them or to consult with an attorney before making that decision. [Appellant] chose, according to the credible evidence presented at this hearing, to waive those rights and give a voluntary statement to the police.

> Counsel's attempt to invoke these rights for [Appellant] was also ineffective. . . . Counsel's phone call to [a City of Pittsburgh police detective] did not invoke [Appellant's] right; only [Appellant] was capable of doing that. [Appellant] was given the opportunity to do so, but, instead, chose to waive his right to counsel and speak with the detectives.

Suppression Court Opinion, 12/29/13, at 13-14.

Upon review of the record before us, we discern no error which would compel us to reverse the determination of the suppression court. Accordingly, we conclude that Appellant's claim lacks merit.

In his third issue, Appellant continues his argument that the suppression court erred in failing to grant his motion to suppress his statements to police. Appellant's Brief at 37-40. Specifically, Appellant contends that the waiver of his *Miranda* rights was not knowing and voluntary because he suffered from mental illness and was subjected to coercive police tactics.

As noted, under *Miranda*, police officers are required to inform a suspect prior to questioning that he has the right to remain silent, that any statement made may be used against him, and that he has the right to an attorney. *Miranda*, 384 U.S. at 444. "The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently." *Id*. "It is the Commonwealth's burden to establish whether [the accused] knowingly and voluntarily waived his *Miranda* rights. In order to do so, the Commonwealth must demonstrate that the proper warnings were given, and that the accused manifested an understanding of these warnings." *Eichinger*, 915 A.2d at 1135-1136.

In order to determine if a proper waiver of *Miranda* rights has occurred, the following test is employed:

The voluntariness standard of *Miranda* requires that the prosecution prove by a preponderance of the evidence that the

waiver is knowing and intelligent. This requires a two-step analysis. First, the waiver must have been voluntary in the sense that it was an intentional choice made without any undue governmental pressure; and, second, that the waiver must have been made with a full comprehension of both the nature of the right being abandoned and the consequences of that choice. We employ a totality of circumstances test in reviewing the waiver. We are bound also by the suppression court's findings of fact if they are supported by competent evidence.

*Commonwealth v. Logan*, 549 A.2d 531, 537 (Pa. 1988) (citation omitted).

In *Logan*, "[t]he [a]ppellant was convicted by a jury of . . . first-degree murder and possession of an instrument of crime for axing to death a stranger on a public bus containing five other passengers." *Id*. at 534. After the appellant was apprehended and taken to the police station, he was read his *Miranda* warnings, waived those rights, confessed to committing the killing, and was charged with first-degree murder. *Id*. at 535. Following his arrest and during his trial, the appellant was confined to a mental hospital. *Id*. He had also been institutionalized for mental illness prior to committing the murder. *Id*.

Before trial, the appellant filed a motion to suppress his confession, arguing that his mental illness prohibited him from knowingly and intelligently waiving his *Miranda* rights. *Id*. The trial court denied the motion, a jury ultimately convicted the appellant of first-degree murder, and he was sentenced to death. *Id*. Our Supreme Court summarized the facts surrounding the appellant's waiver of *Miranda* rights as follows:

Uncontested police testimony shows that the [a]ppellant was taken to the interview room of the Police Administration Building where he was read **Miranda** rights from the Standard Police Interrogation Card. [The] [a]ppellant orally indicated at that time that he understood each warning and even asked for clarifications. He then gave a confession which was written out by the interviewing officer who reduced it to typewritten form. [The] [a]ppellant read his typed confession aloud into a tape recorder and signed each page. Prior to giving this confession, he was advised again of the **Miranda** rights. The [a]ppellant apprised the interviewing officer of the fact that he could read and write English because he had gone to the eleventh grade in school. He also denied any recent use of drugs except for a "reefer" which he had smoked several days before the crime. There was no evidence that the [a]ppellant had been coerced or induced by the police into making the confession.

**Logan**, 549 A.2d at 536–537.

In analyzing whether the circumstances confirmed that the appellant's waiver of his **Miranda** rights was voluntary and intelligent, our Supreme Court emphasized "that defendants with proven psychological defects are capable indeed of waiving their constitutional rights and giving voluntary confessions." **Logan**, 549 A.2d at 537 (citations omitted). The **Logan** Court then assessed the voluntariness of the appellant's confession under the two-prong standard. **Id**. Ultimately, the Court concluded that, regardless of the appellant's mental illness, the circumstances of his confession revealed that the waiver was "the product of free, unconstrained, and rational choice of its maker." **Id**. The Court in **Logan** determined that the evidence demonstrated the appellant "was aware of the nature of the right which he was surrendering and of the consequences of that choice." **Id**. at 537-538. **See also Commonwealth v. Bracey**, 461 A.2d 775, 782

n.7 (Pa. 1983) (stating that "a person with a mental illness including a history of hallucinations and delusions may be capable of waiving her constitutional rights").

Here, the suppression court made the following relevant findings of fact:

3. On October 9, 2012, [Appellant] was alleged to have set the porch to his parent's house on fire. Although he was eventually charged with one count of Arson, one count of Risking a Catastrophe and two counts of Recklessly Endangering Another Person as a result of that, those charges were not filed until October 19, 2012.[2] On October 9, [Appellant] voluntarily committed himself to Jefferson Regional Medical Center's psychiatric ward, where he remained until discharge on October 19, 2012.

> [2] Those charges were withdrawn at the November 11, 2012 preliminary hearing.

4. The Jefferson records reported that [Appellant] suffered from homicidal ideation concerning his parents and experienced command auditory hallucinations. At discharge, he was still noted to have a depressed mood, but no psychotic thinking and denied any homicidal or suicidal ideation. He was directed to follow up with outpatient care and had an appointment scheduled for October 25, 2012. (Exhibit A).

5. After his discharge from Jefferson, he was charged with the arson offenses and remanded to the County Jail as he was unable to post bail.

* * *

13. On October 25, 2012, in the morning, Detectives Bolin and McGee obtained a Court Order permitting them to transport [Appellant] to their office to be interrogated. (N.T. 81). Detective McGee stated that during his interview, [Appellant] seemed responsive to his questions and that there was nothing out of the ordinary about his demeanor as he was speaking with them. (N.T. 9).

14. When [Appellant] was told that they wanted to talk to him about a stabbing on the South Side, [Appellant] initially denied any knowledge. At this point, Detective McGee suggested to [Appellant] that they call his mother and have her come out and sit down and talk with him. According to Detective McGee, [Appellant] thought that was a good idea and [Appellant's] mother was called. (N.T. 9).

15. [Appellant's mother] arrived at approximately 12:30 p.m. and met with her son for approximately 35 to 40 minutes. She then came out of the room and told the detective that [Appellant] wanted to tell them what had happened that night. (N.T. 10).

16. Detective McGee, prior to resuming his discussion with [Appellant], informed him of his **Miranda** Rights by reading to him from a Pittsburgh Police **Miranda** Rights form. That form was admitted as Commonwealth Exhibit 1. It bears the signatures of Detective McGee, [Appellant] and [Appellant's] mother. The detective read the questions out loud and then recorded [Appellant's] answers. He then handed the form to [Appellant] for his review. He observed as [Appellant], and then [Appellant's] mother, Patricia Arlett, signed the form. (N.T. 11).

\* \* \*

23. [Appellant] was evaluated at the Court's Behavior Assessment Unit and report was issued on October 30, 2012. He was deemed incompetent to stand trial because his psychiatric symptoms were significant barriers in cooperating with his attorney. [Appellant] did, however, have a factual and rational understanding of the charges against him. (Court Exhibit 1 A).

24. [Appellant] was reevaluated by the Behavior Assessment Unit on November 12. He was still deemed incompetent on the same basis. It was recommended that [Appellant] be transferred to Torrance State Hospital. (Court Exhibit 1 B).

25. The forensic summary from Torrance stated that [Appellant] was "....suspicious, paranoid towards others and responding to voices most likely. He has poor insight, poor judgment and poor impulse control." (Exhibit B). [Appellant's] diagnoses were: "Psychosis, not otherwise specified"; "Bipolar Disorder, not

otherwise specified" and "Marijuana Abuse, in Remission Secondary to Controlled Environment" at Axis I and "Antisocial Personality Disorder" at Axis II.  (Exhibit B).

Suppression Court Opinion, 12/29/13, at 3-10.

In concluding that Appellant voluntarily waived his ***Miranda*** rights, the suppression court offered the following thoughtful analysis, which we adopt:

> [Appellant] contends that his statement was not voluntary because he was not competent to waive his rights as a result of mental illness.  This claim has given this Court the most difficulty.  There can be no dispute that [Appellant] suffered, at the time of his interrogation, from severe mental illness.  There are psychiatric records from before and after the date he gave his statement which reveal that [Appellant] suffers from psychosis and bipolar disorder.  They further reveal that he experienced auditory hallucinations, homicidal and suicidal ideation.  He was determined by this Court's behavior assessment unit to be incompetent five days after he provided his statement to the police.  Those records reveal that [Appellant] stopped taking the medications that had been prescribed at Jefferson and which greatly improved his mental health upon his discharge on the 19th.  He did not resume taking them until October 27, which means that when he was taken to the homicide unit on the 25th, he had been off of his medication for at least 6 days.
>
> * * *
>
> Here, there is evidence that a few days after his statement, [Appellant] was not competent.  Clearly, he suffered from mental illness.  The record does not establish, however, that that illness prevented him from fully understanding his rights and voluntarily waiving those rights on October 25, 2012.  The only evidence on the record concerning [Appellant's] condition that day is the testimony from those who were with him around the time he gave his statement; Detectives McGee and Bolin and [Appellant's]  mother.  None of them testified as to any apparent difficulty [Appellant] was having that day understanding his rights and interacting appropriately with the detectives.  His mother was asked if she told him not to talk to the police because she thought he did not know what was going

- 18 -

and she responded, "No." (N.T. 76). When asked if she had any concerns about his ability to understand what was going on and she responded, "I don't know. I mean, I did, but I wasn't sure. Like I said, I was scared." (N.T. 76).

In the absence of testimony from an expert stating that, at the time [Appellant] gave his statement he was unable, due to mental illness, to knowingly and voluntarily waive those rights, this Court is constrained to conclude that [Appellant's] waiver was knowing, intelligent and voluntary. While the records offered established that the defendant is mentally ill, they did not establish that his illness was such that he was not capable of giving a knowing, voluntary and intelligent waiver of his rights. Based on the evidence presented at the suppression hearing, the Court finds that the Commonwealth has met its burden, by the slimmest of margins, of establishing that [Appellant's] *Miranda* waiver was knowing, intelligent and voluntary.

Suppression Court Opinion, 12/29/13, at 14-17. Likewise, upon review of the certified record, we conclude that, despite Appellant's mental health issues, he knowingly and intelligently waived his *Miranda* rights on October 25, 2012. Hence, we conclude that Appellant's contrary claim lacks merit.

In addition, Appellant contends that the waiver of his *Miranda* rights and subsequent confession was not voluntary due to the alleged coercive conduct of the police. Appellant alleges that the police offered to reduce the charges filed against Appellant in exchange for a statement. Appellant's Brief at 40. However, upon review we conclude that this claim also lacks merit.

"The determination of whether a confession is voluntary is a conclusion of law, and as such, is subject to plenary review." *Commonwealth v. Roberts*, 969 A.2d 594, 599 (Pa. Super. 2009). In evaluating the

voluntariness of a confession, this Court looks at the totality of the circumstances to determine whether, because of police conduct, the defendant's "will has been overborne and his capacity for self-determination critically impaired." *Id*. at 598-599 (citation omitted).

Here, the suppression court made the following finding of fact with regard to whether the police promised Appellant a reduction in charges in order to coerce a confession:

> 18. [**Appellant's**] **mother testified that she was promised that if** [**Appellant**] **gave a statement, the charges would be reduced to simple assault.** She further claimed to only have talked to [Appellant] for a few minutes; that she was not present when [Appellant] was advised of his rights and that she thought the interrogation rights waiver form she signed was actually an agreement to reduce the charges. **The Court does not find these assertions credible.** The interrogation rights form, a single page form, states, in bold, capital letters across the top, "CITY OF PITTSBURGH BUREAU OF POLICE MIRANDA RIGHTS FORM." (See Exhibit 1). The body of the form is in a series of questions. [Appellant's mother's] signature is directly below that last question and it is inconceivable that someone could mistake this form for anything other than what it is.

Suppression Court Opinion, 12/29/13, at 8 (emphases added). Our review of the certified record reflects no evidence beyond the testimony of Appellant's mother that Appellant was induced into making a statement with the claim that he would receive reduced charges. Accordingly, we are left to conclude that the discredited statement from Appellant's mother does not support his allegation. Therefore, this claim lacks merit.

Appellant's final argument is that the trial court erred in failing to admit into evidence testimony from Appellant's previous attorney and a

medical expert regarding whether Appellant's made a voluntary confession to the police about the present incident. Appellant's Brief at 41-43. Specifically, Appellant contends that his proffered testimony from Attorney Daniel Joyce concerning counsel's request to police that Appellant not be interviewed without counsel present, and from Doctor Christine Martone regarding Appellant's metal state at the time of his confession, was admissible.

We begin by noting that questions concerning the admissibility of evidence lie within the sound discretion of the trial court, and we will not reverse the court's decision on such a question absent a clear abuse of discretion. *Commonwealth v. Maloney*, 876 A.2d 1002, 1006 (Pa. Super. 2005). An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence or the record. *Commonwealth v. Cameron*, 780 A.2d 688, 692 (Pa. Super. 2001).

Before any evidence is admissible in a criminal proceeding, it must be competent and relevant. *Commonwealth v. Freidl*, 834 A.2d 638, 641 (Pa. Super. 2003).

> Relevance is the threshold for admissibility of evidence. *Commonwealth v. Cook*, 597 Pa. 572, 602, 952 A.2d 594, 612 (2008). Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Pa.R.E. 401. "Evidence is

relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact." ***Commonwealth v. Drumheller***, 570 Pa. 117, 135, 808 A.2d 893, 904 (2002), ***cert. denied***, 539 U.S. 919, 123 S.Ct. 2284, 156 L.Ed.2d 137 (2003). "Evidence that is not relevant is not admissible." Pa.R.E. 402. "Although relevant, evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Pa.R.E. 403.

***Commonwealth v. Williams***, 48 A.3d 1265, 1268-1269 (Pa. Super. 2012).

With regard to Appellant's attempt to have Attorney Joyce testify that he had informed police that he wanted to be present for any questioning of Appellant, we fail to see how this matter was relevant as it does not tend to establish the voluntary nature of Appellant's statement to police. As we previously discussed, at the time Appellant was interviewed by police, he was not charged with the instant crimes. Therefore, Appellant's Sixth Amendment right to counsel had not attached. In addition, with regard to Appellant's Fifth Amendment rights, such rights could only be invoked by Appellant. As mentioned above, Appellant personally waived his rights by signing a ***Miranda*** waiver form prior to making his statement to police. Consequently, any discussion Attorney Joyce had with police prior to Appellant being interviewed was not relevant as to the voluntary nature of Appellant's statements, and Appellant has failed to establish an abuse of discretion. Hence, his contrary claim lacks merit.

In addition, Appellant claims that the trial court erred in failing to permit testimony from Dr. Martone concerning the nature of Appellant's mental illness and its effect upon Appellant's cognitive functions. Appellant wanted Dr. Martone to testify regarding the effects of Appellant's mental illness at the time of his statement to police, thereby attacking the voluntary nature of Appellant's statement.

As with all other evidence, the admission of expert testimony is a matter of discretion for the trial court and will not be remanded, overruled or disturbed unless there was a clear abuse of discretion. *Commonwealth v. Brewer*, 876 A.2d 1029, 1035 (Pa. Super. 2005). Again, a finding of abuse of discretion may not be made "merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous." *Commonwealth v. Laird*, 988 A.2d 618, 636 (Pa. 2010) (quoting *Commonwealth v. Sherwood*, 982 A.2d 483, 495 (Pa. 2009)).

Our review of the record reflects that Dr. Martone, as a member of the the trial court's behavior assessment unit, evaluated Appellant on two occasions after he gave his statement to police on October 25, 2012. As the suppression court states in its findings of fact:

> 23. [Appellant] was evaluated at the Court's Behavior Assessment Unit and report was issued on October 30, 2012. He was deemed incompetent to stand trial because his psychiatric symptoms were significant barriers in cooperating with his

attorney. [Appellant] did, however, have a factual and rational understanding of the charges against him. (Court Exhibit 1 A).

24. [Appellant] was reevaluated by the Behavior Assessment Unit on November 12. He was still deemed incompetent on the same basis. It was recommended that he be transferred to Torrance State Hospital. (Court Exhibit 1 B).

Suppression Court Opinion, 12/29/13, at 9.

Completely lacking from the record, or from Appellant's argument in his appellate brief, is any indication that Appellant was evaluated just prior to the time of his statement to police on October 25, 2012. Rather, the record establishes that on October 30, 2012, five days after giving his statement to police, Appellant was evaluated and deemed incompetent to stand trial. Accordingly, we conclude Appellant has failed to establish that the trial court committed an abuse of discretion in declining to admit the expert testimony at issue.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/31/2015

- 24 -